## Dows and CARY *vs.* GREENE and MATHER.

To justify a jury in finding that a clerk in a mercantile house had authority from his principals to sign shipping bills in their names, it is not necessary that an express power should be proved. It will be sufficient if it appears that the clerk had before done such acts, or that he occupied a position in the business of his employers which usually entitles the incumbent to perform acts of that nature.

Shippers, upon executing shipping bills, become bailees, either of the shippers or of the consignees, according to the right of property as between them.

And as between the shippers and the consignees, the latter, when they receive the bills consigning the property to them, and accept the drafts of the shipper, upon the strength of the consignment, become factors *del credere*, and acquire an interest in the property, which cannot be defeated by the shippers, or by a person claiming to have purchased the same from them.

The consignment of the property, and the advances made thereon by the consignees, upon the credit of the consignment, will vest in the consignees the right of property, and the constructive possession also.

And though the person for whom the consignees have advanced money upon the property, may have acted fraudulently, in obtaining the shipping bills, without having paid for the property, yet if the advances were made by

the consignees in good faith and without any knowledge of the fraud, the shippers will lose their right of reclaiming the property, and their title will be divested as against the consignees; who, to the extent of their advances, will be considered *bona fide* purchasers thereof.

Although, for the purposes of revenue, every master of a boat conveying property on the canals is required to exhibit to certain collectors a bill of lading, signed by himself and the consignor, the signature of the master is not necessary to give the bill of lading effect as a commercial instrument.

If a bill of lading is signed by the consignor, that is sufficient to vest in the persons to whom the bill of lading is delivered, the right of property as consignees.

THIS action was brought to recover the possession of 2565 bushels of corn. It was tried at the Albany circuit, in October, 1849, before Mr. Justice Hand. The plaintiffs were commission merchants, doing business in the city of New-York. One of them, being in Rochester, early in August, 1848, agreed with one Mack to advance to him upon certain corn which Mack represented he was about purchasing in Buffalo, 38 cents per bushel. Upon the production of shipping bills for the corn to the plaintiffs' agent at Rochester, he was to indorse Mack's drafts upon the plaintiffs for the amount of the advance, and the plaintiffs were to accept the drafts. The shipping bills were to be sent to the plaintiffs. On the 8th of August, Mack presented to the agent at Rochester two shipping bills made at Buffalo and bearing date the day previous, which bills were signed by Niles and Wheeler *for E. H. Walker,* and were to the effect that they had shipped on board certain canal boats 4925 bushels of corn, on account of Mack, and consigned to the plaintiffs. Upon the receipt of these bills the plaintiffs' agent indorsed two drafts drawn by Mack upon the plaintiffs, one at 30 days for $1000, the other at 25 days, for $800, and forwarded the shipping bills to the plaintiffs. Two other shipping bills were produced in like manner, on the 10th of August, and two other drafts, amounting to $2034, were indorsed and delivered to Mack. These shipping bills were also forwarded to the plaintiffs. All the drafts were accepted and paid at maturity. The corn shipped upon the four boats amounted to 10,091 bushels.

It appeared upon the trial, that on the 7th of August, which

was Monday, one Bloss, who acted as agent of Mack in purchas
ing the corn, applied to Niles, one of the firm of Niles & Wheeler,
to purchase the corn.   The corn was then in the vessel which
had brought it down the lake.   It was agreed that the price
should be 44 cents per bushel.   Niles & Wheeler were to trans-
fer the corn to canal boats, and give Bloss the refusal of it until
the following Friday.   Bloss was to pay for two boat loads on
*Friday,* and the other two on *Saturday.*   It was also agreed
that Niles & Wheeler should ship the corn to New-York at 13
cents per bushel.   After the interview between Niles and Bloss,
on the 7th of August, and on the same day, Bloss procured from
the persons who transferred the corn to the canal boats, a mem-
orandum of the quantity of corn upon two boats, and pre-
sented it to Walker, a clerk of Niles & Wheeler, at their office,
and requested him to make out shipping bills for these two boat
loads.   Walker did so, and delivered the bills to Bloss, by whom
they were forwarded to Mack, at Rochester, the same evening.
On Wednesday following, Bloss procured the other two bills in the
same way.   Niles & Wheeler were not informed of the fact that
these bills had been made and delivered to Bloss, until *Friday,*
although they were entered in the books kept in the office, in the
usual manner.   On Friday, Bloss informed Niles that he had
sent the bills to Mack, and that Mack had failed to transmit
funds to pay for the corn.   Niles immediately informed the plain-
tiffs by telegraph, that the corn had not been paid for, and re-
quired them to hold the corn for Niles & Wheeler until further
notice.   It was proved by a clerk in the New-York telegraph
office, that the notice did not reach New-York until the evening
of Sunday, the 13th, and that it was delivered on Monday morn-
ing.   Two of the drafts had been accepted on the 10th, and the
other two on the 12th.   Mack, upon receiving the drafts, in-
dorsed by the plaintiffs' agent, had procured them to be dis-
counted by a bank in Rochester, and had absconded with the
proceeds.   Dows, one of the plaintiffs, met with him going down
the Hudson river Saturday night.   He said he was going east,
and asked Dows to let him have $25, and he did so.   On Mon-
day following, Mr. Caleb, who was connected with Niles &

Dows *v.* Greene. •

Wheeler in the transportation business, in consequence of a communication received by him from Niles & Wheeler, called on Dows and inquired about the responsibility of Mack. Dows informed him that he was worth 20 or 25 thousand dollars.

The shipping bills not being signed by the captain or master of the boats, evidence was given upon the question whether, according to the usage which had obtained, such bills could be transferred by mere delivery. Evidence was also given as to the authority of Walker to sign the bills in the name of Niles & Wheeler.

On Saturday, after being informed by Bloss that he could not pay for the corn, Niles sold the corn to P. Durfee & Co. and gave them a bill of sale. The boats had previously left Buffalo. Niles followed the boats and obtained from the captains their signatures to new bills of lading, bearing date the 12th of August, stating that the corn was shipped on account of P. Durfee & Co. and consigned to Arthur H. Root, Albany. They were signed by Niles & Wheeler, and indorsed by the captains of the boats respectively. In other respects they corresponded with the first set of bills. These bills were on Monday following delivered to Durfee & Co. and Niles and Wheeler received their drafts upon Root for the price of the corn. On the 21st of August, Root sold the corn to the defendants and received payment therefor by a draft upon L. W. Brainard, New-York, payable ten days after date. On the 22d of August, Dows, one of the plaintiffs, was at Albany, and demanded the corn in question of Greene, one of the defendants. He refused to deliver it up, claiming to have purchased it of Root. This action was brought on the same day. The defendants gave the requisite security and retained the property.

Upon the trial, several objections were made by the plaintiffs' counsel to the admission of evidence, which it is unnecessary to mention here, as they are sufficiently noticed in the opinion of the court. The testimony being closed, the judge submitted the following propositions to the jury. 1. That it was evident the conduct of Mack, for whom Bloss was acting, had been fraudulent in the matter, and Mack could not have held the property, as be-

tween him and the defendants.   2. That if Mack were merely
the agent of the plaintiffs and doing business for them, and
obtained the property by fraud, the plaintiffs could not ac-
quire a good title to the property although they were not per-
sonally concerned in the fraud and had no personal knowledge
thereof.   3. That the fact of the plaintiff Dows seeing Mack when
he was probably running away, was only a circumstance in the
case, and they must be convinced by the evidence, that the plain-
tiffs in some way aided in the fraud, or at least connived at it, in
order to affect their rights.   That the evidence of a participation
by the plaintiffs, or any of them, in the fraud, or of their knowl-
edge thereof, if any, was at most very slight, but that was a
question of fact.   That the papers delivered by Walker, the clerk,
to Bloss, were not properly bills of lading according to commer-
cial usages, and therefore, as such, could not be negotiated by
a mere indorsement thereof, nor by delivery only, so as to trans-
fer the property.   4. That the proof upon the point, whether by
usage and custom, such a paper in this state could be so trans-
ferred, rather preponderated against it, and he thought the testi-
mony insufficient to change the general rule of law upon the
subject, but the testimony upon the point was submitted to their
consideration.   5. That he did not think these questions so im-
portant, for the material question in the case was, whether
Walker had power to sign the papers he gave to Bloss.   If he
had power to sign the papers for Niles & Wheeler, the plaintiffs
were entitled to recover, unless they had notice, in some way, of
the fraud practiced upon Niles & Wheeler to get the corn before
the drafts were used, or were not *bona fide* purchasers thereof,
of Mack.   That although not technically bills of lading, they
would amount to an admission by Niles & Wheeler, the owners
of the corn, that Mack owned it.   And if, upon the strength of
that evidence of ownership, the plaintiffs or their agent had been
induced to purchase it, or advance money upon it, without notice,
Niles & Wheeler were too late, after that, to repudiate the
transaction.   That the power of Walker need not be express ;
that it was sufficient that he held that situation or position in
their business which usually entitled the incumbent to do such

Dows *v.* Greene.

acts. 6. That the fact of the papers being executed by a clerk, was a circumstance to put a party on inquiry, but it was merely a circumstance for the consideration of the jury on the question of good faith. To each and every part of the charge contained in these propositions, the plaintiffs' counsel excepted. The verdict was for the defendants. Judgment having been entered upon the verdict, the plaintiffs appealed.

*R. W. Peckham,* for the plaintiffs.

*S. Stevens.* for the defendants.

*By the Court,* HARRIS, J. The judge at the circuit, very properly told the jury that the material question in the case was, " whether Walker had power to sign the papers he gave to Bloss." I think he might have gone farther and said that this was the only question for their decision. The principles of law applicable to that question were also well stated by the learned judge. He instructed the jury that, to justify them in finding such authority, it was not necessary that the plaintiffs should show an express power, but that it would be sufficient, if Walker had before done such acts, or occupied a position in the business of Niles & Wheeler which usually entitles the incumbent to perform such acts. Having thus submitted to the jury the question of Walker's authority, and the rules by which they were to be guided in the decision of that question, I think the judge should have instructed the jury to find their verdict for the plaintiff or defendant as they should determine that question. As I view the case there was no other question of fact which could properly have been submitted to the decision of the jury.

Assuming that Walker was authorized to sign the shipping bills, and it does not seem to have been questioned by Niles & Wheeler themselves, at the time of the transaction, Niles & Wheeler acknowleged by those bills that Mack was the shipper of the corn, and that they had received it from him, as carriers, to forward, on his account, from Buffalo to New-York, and there to deliver it to the plaintiffs as consignees. The plaintiffs were

Dows *v.* Greene.

thus clothed with *prima facie* evidence of ownership. This evidence might have been rebutted by showing that the corn had been consigned to the plaintiffs as the agents of Mack. Such proof would defeat an action by the plaintiffs against the carriers for injury to the property or for not delivering. But in the absence of such proof, the consignees alone could maintain an action against the carrier for a breach of his contract to deliver. Niles & Wheeler, therefore, when they executed the shipping bills, made themselves bailees, either of Mack, the shipper, or the plaintiffs, as consignees, according to the right of property, as between them. And, as between the latter, the plaintiffs, when they received the bills consigning the property to them, and accepted the drafts of the shipper upon the credit of the consignment, became factors *del credere*, and acquired an interest in the property which could not be defeated by Mack, or by Niles & Wheeler. The consignment, and the advances made upon the credit of the consignment, vested in the plaintiffs the right of property and the constructive possession also. Niles & Wheeler had, by their own act given to Mack " the external *indicia* of the right of disposing of their property." Mack acted fraudulently, it is true, but the plaintiffs are not implicated in his fraud. Acting upon the evidence, with which Niles & Wheeler had furnished Mack, of a right to dispose of the corn, they made their advances in good faith. When this was done Niles & Wheeler, though they had been imposed upon, lost their right of reclaiming their property. Their title, good as against Mack, was divested, as against the plaintiffs, who, to the extent of their advances, had become *bona fide* purchasers, from their fraudulent vendee. (*Saltus* v. *Everett,* 20 *Wend.* 267. *Grove* v. *Brien,* 8 *How. U. S. R.* 429. *Gibson* v. *Stevens,* *Id.* 384.)

It was insisted upon the trial, that the instruments signed and delivered by Walker to Mack, and upon which the plaintiffs rely as the evidence of their title, were not executed in such a manner as to make them shipping bills, or bills of lading, according to commercial usage. This seems to have been the opinion of the learned judge who tried the cause. It is true, that, for the

Dows *v.* Greene.

purposes of revenue, every master of a boat conveying property on the canal is required to exhibit to certain collectors a bill of lading, signed by himself, and by the consignor of the property. (1 *R. S.* 240, § 121.) But I do not understand that the signature of the master is necessary to give the bill of lading effect as a commercial instrument. The master of the boat or vessel carrying the property is the agent of the owners. When he signs the bill of lading he signs it as their agent. It is their contract, not his. (3 *Kent's Com.* 207.) It would be a singular anomaly, indeed, if the signature of the agent should be requisite to give validity to an instrument already signed by the principal. From the very nature of the business, the bill of lading must, in many instances, be signed by the master; but when the owner does sign the bill, he estops himself from denying its validity. If, then, the signature of Walker is to be regarded as the signature of Niles & Wheeler, the bills were executed in such a manner as to vest in the plaintiffs the right of property as the consignees of the corn.

The evidence offered by the defendants to show that the bills of lading were fraudulently obtained by Mack, was objected to by the plaintiffs' counsel, and the objection was overruled. I think the testimony ought not to have been received. The plaintiffs had shown themselves bona fide purchasers of the corn, to the extent of their advances. The defendants, when offering evidence to show the fraud of Mack, did not propose to connect the plaintiffs with that fraud. And yet, unless the good faith of the plaintiffs could be impeached, evidence of Mack's fraud was irrelevant and tended improperly to influence the minds of the jury. For the same reason, I think the evidence of the sale to Durfee & Co. and then by their consignee to the defendants, should have been excluded. It could only have been admissible after the plaintiffs' title had been impeached by showing that they were not entitled to protection as purchasers in good faith. So, too, the declarations of Bloss, the agent of Mack, made on Saturday evening, after the shipping bills had been forwarded to the plaintiffs and the drafts had been accepted, were clearly inadmissible as evidence against the plaintiffs. Such evidence

could have no legitimate bearing upon the case, and it is impossible to say what improper influence it may have exerted upon the minds of the jury.

If I am correct in the view I have taken of the legal principles involved in this case, it follows that the charge was erroneous in several particulars. There was no evidence whatever to warrant the jury in finding that Mack, whose conduct was certainly fraudulent enough to vitiate the whole transaction so far as he was concerned, was acting as the plaintiffs' agent, or was doing business for them, or that the plaintiffs were personally concerned in, or had any knowledge of the fraud. And yet the jury were instructed that in either of these cases the plaintiffs could not acquire a good title to the property. The jury might well have understood from this part of the charge, that they were at liberty to find that the plaintiffs were parties to the fraud. Indeed in a subsequent part of the charge, after stating his opinion that the evidence of a participation in the fraud by the plaintiffs, or of their knowledge thereof, was at most very slight, the learned judge submits it to the decision of the jury as a question of fact. I think he should have told the jury that there was no evidence to sustain a verdict against the plaintiffs in that respect.

It was also erroneous to submit to the consideration of the jury, the evidence relating to the usage in respect to the transfer of shipping bills by delivery. It is true that the learned judge told the jury that he did not deem these questions so important, for, if Walker had power to sign the papers he delivered to Bloss, the plaintiffs were entitled to recover, unless they had notice of Mack's fraud, or were not bona fide purchasers. But why submit the evidence on the subject of usage to the consideration of the jury at all? Being submitted to their consideration, they had a right to infer that it was submitted for some purpose, and that it was their duty in some way to take it into account in making up their verdict.

A still more objectionable part of the charge is that in which the learned judge instructs the jury that the fact of the papers being executed by a clerk, was a circumstance to put the plaintiffs

on inquiry, and might be considered on the question of good faith. It is true that the plaintiffs, when they made their advances upon the credit of these bills, took the risk of their genuineness. Had they been forged, or had they been executed in a manner not to make the act of the clerk the act of his principals, they, of course, would have acquired no title to the corn. But what was there in the fact that a clerk had signed the name of Niles & Wheeler, rather than one of the firm, that should put the plaintiff upon inquiry as to the honesty of the transaction? Is there any thing to furnish ground for suspicion in the fact that a clerk is employed to sign papers of this description? The question of the authority of the clerk to sign had already been properly presented to the jury. The principles applicable to that question had been well stated, and there the subject should have been left. To tell the jury after this, that though they should find that the clerk had authority, yet the mere fact of his signing the papers was a suspicious circumstance, calculated to awaken caution on the part of the plaintiffs, and calling upon them to inquire into the fairness of the transaction, could scarcely have failed to embarrass and mislead them.

The judgment must be reversed, and a new trial awarded, with costs to abide the event.

[ALBANY GENERAL TERM, September 6, 1852. *Parker, Wright* and *Harris,* Justices.]