## DAVID DOWS, survivor of Ira B. Cary, *vs.* JOHN RUSH.

A statement of the evidence, or a comment upon it or its effect; an assumption of a fact in the cause; or a mere reference to what is established by the evidence, by a judge in his charge to the jury, are not grounds of exception to the charge.

A party who is dissatisfied with the expression of an opinion, by a judge upon a question of fact, or the conclusion at which he arrives in regard to it, must express that dissatisfaction, not by excepting to the charge of the judge on that point, but by asking to have the question of fact submitted to the jury for their determination.

An exception to the *charge*, on the ground that a particular question should have been submitted to the jury as a question of fact, is not a compliance with this rule ; where the judge has made no charge to the contrary, nor been *requested* to submit the question to the jury, and has not *refused* to do so.

An exception to the charge, in such a case, is not equivalent to a *request* to the judge to submit the question, and a *refusal* to do so.

A general exception to the whole charge, and to each and every part thereof, raises but a single exception to the entire charge, and is unavailable if any portion of it be correct.

Whether it is sufficient, within this rule, for a party to except to the charge " and to each part thereof *separately and distinctly ?*" *Quære.*

N. & W. of Buffalo, being the owners of a quantity of corn, at that place, sold the same to M., through B,. his agent ; it being a part of the arrangement that N. & W. should transport the corn to New York, for M., on their boats. N. & W. thereupon executed an instrument stating the shipment of the corn, the quantity thereof, the name of the boat, the amount of freight, the terms of payment of the purchase money; and that the corn was on account of, and addressed to, M., care of D. & C., and was to be delivered as addressed, without delay.  *Held* that this was a bill of lading.

*Held also*, that upon its face, the instrument was a certificate from N. & W. in both their capacities, of owners of the shipping boat and owners or vendors of the corn, that the grain was shipped on account of M. or for his benefit, and for his benefit as the purchaser and owner of the goods, to D. & C. as consignees,

And such bill of lading having been delivered by N. & W. to B., and by him sent to M, ; *Held* that M. had lawful possession of the same, as apparent owner, and through such bill of lading the constructive—the legal—possession of the corn; and that the transfer of such bill by him, amounted to a transfer of the corn.

*Held further*, that persons receiving, in good faith and as security for advances actually made, a transfer of the bill of lading and of the goods, from M., were brought within the protection of the rule of law which prefers the title of a bona fide purchaser from a fraudulent vendee, to that of the original owner.

Dows *v.* Rush.

*Held, also,* that in the absence of proof that the purchase of the corn was *originally* fraudulent, or that the transaction was obnoxious to any other imputation of fraud than such as arose from a *subsequently conceived* determination not to pay for the goods, N. & W. and those claiming title to the corn under them, were, as against the assignees of the bill of lading, *estopped* from denying that N. & W. held the grain as M.'s agents and carriers; they not being ia a situation effectually to dispute the title of the assignees, thus acquired.

D. & C., the assignees of the bill of lading, were to be deemed the consignees of the corn, and as such entitled to a *lien* thereon, for the amount of their advances, under the act relative to *principals and factors.* (*Laws of* 1880, *ch.* 179, §§ 1, 2. *2 R. S. 4th ed.* 184.)

The statute does not limit the consignees to the right of detention of the goods when in their actual possession, for the enforcement of their lien; but it also authorizes an action by them, to obtain possession, against a party claiming them without right, or under an inferior title.

In such an action the plaintiffs are not restricted, in respect to the amount of damages, to their advances and interest thereon.

In an action of replevin, by a party having a lien, the plaintiff, as in other actions of replevin, is entitled to a return of the property, and if a return cannot be had, to its value.

ACTION to recover 2703 bushels of corn, being the cargo of the canal boat Cuba, of which the appellant was master. The action was tried before Justice EDMONDS, on the 21st day of December, 1849, who *directed* the jury to find for the plaintiffs, to which the defendant excepted. Judgment was rendered upon the verdict for $2559.64. The defendant appealed to the general term on a bill of exceptions. The plaintiffs were commission merchants in New York, and claimed the property under a bill of lading in the following words:

"No. 142—Duplicate. Buffalo, Aug. 7, 1848.

Shipped in good order, by Niles & Wheeler, agents, on board canal boat Cuba, master, Am'n Trans. Co. Line, the following named articles, marked and consigned as in the margin, to be delivered as addressed without delay.

| | |
|---|---|
| Ac. I. F. Mack, care of Dows & Cary, New York. | 2540 bush. corn, 142, 2406. |
| (In pencil) | Freight to New York, a bushel, 13c. |
| Drft. 8 Aug., at 30 days, | NILES & WHEELER, |
| $1000. | per E. H. Walker." |

Niles & Wheeler were forwarders at Buffalo, and agents of the American Transportation Line of canal boats, which line was owned by them and M. M. Caleb, of New York, who was their partner in the forwarding business. That business was transacted in New York under the firm name of M. M. Caleb & Co. Niles & Wheeler also purchased and sent corn to market on their own account. In this business Caleb probably had no interest, except in the freight. Mack resided at Rochester, and was a dealer in grain. James L. Bloss resided at Rochester, and had for several years been purchasing grain in his own name, but in fact as the agent of other persons and by their direction. He had for five or six months previous to the transaction in question been making such purchases from other parties than Niles & Wheeler, as the agent of Mack; and had subsequently received the money from him to pay for such purchases. In transactions of this kind he had asked for duplicate bills of lading, and the vendors had in some cases given the bills before the delivery of the property, and before receiving payment. They had trusted to his honor and the integrity of the man at Rochester to send the money, and it had always come. That was the reason alleged by him why he went in and got the bills of lading in question in this case.

Niles & Wheeler resided at Buffalo and had purchased a cargo of about 10,000 bushels of corn, which was on board the propeller Montezuma, lying near their warehouse at Buffalo. On Monday, the 7th of August, 1848, Bloss called at the office of Niles & Wheeler and proposed to purchase the corn, intending it for Mack, but did not mention the fact that he was acting as an agent. The negotiation was between Bloss & Niles. The price asked was 44 cents per bushel, and Bloss said he would take the corn if he could have a little time to get money from Rochester, and gave a reference for certainty of payment. Niles said he wanted no reference, as they would only sell the corn for cash. Bloss thereupon left the office, but was immediately called back by order of Niles, when the negotiation proceeded. Niles asked where Bloss

wished to transport the corn, and on being answered to New York, he said they could perhaps make an arrangement if he (Niles) could transport the corn. It was finally agreed that Bloss might have the corn by paying for it on Friday; that the money should be paid, half on Friday and the remaining half on Saturday, and that Niles & Wheeler should transport the corn to New York on their boats, at thirteen cents per bushel. Niles said he would not sell on credit to any body— that he would hold the corn on his boats until it was paid for. Bloss said Niles would be indemnified by the property itself, as he (Bloss) would not get possession of it until it was paid for. Bloss immediately telegraphed to Mack advising him of the purchase of the corn, mentioning the quantity and price; and on the evening of the same day Bloss received the bill of lading before referred to, executed in the name of Niles & Wheeler, by Walker, their clerk. He had been before in the habit of making out bills of lading, and evidence was given on the part of the plaintiffs sufficient, uncontradicted, to show a general authority upon that subject. The defendant gave evidence tending to show that Walker had no authority to sign such bills of lading, but only bills for *short freight*, that is, for places short of New York, and not where the goods shipped belonged to Niles & Wheeler. He made a distinction between receipts for property and memoranda of shipment (such as he claimed these to be) and regular bills of lading. The corn was shipped on the boats Cuba, Neptune, P. B. Langford and A. Beardsley. The lading was, according to Bloss, commenced on the same day, (Monday, 7th August,) others thought at a later day, and, as Bloss thinks, it was completed as to two boats (the Cuba and Neptune) the same day. Van Inwegen, the tally clerk, says the loading of the Neptune was commenced on Monday and completed on Tuesday or Wednesday; and the Cuba (the one in question) started first, on the 9th, Wednesday, and the Neptune on the 10th, Thursday. The evidence left the time of lading in some doubt. On Monday, the day of the purchase, Bloss got the tallies of the cargo of

Dows *v.* Rush.

the two boats, (Cuba and Neptune,) and delivered them at the office of Niles & Wheeler about six or seven o'clock in the evening, and received from Walker, their clerk, bills of lading of the two boats, similar to that above mentioned. Bloss sent the bills of lading to Mack the same day, informing him that the corn was to be paid for on Friday or Saturday. The plaintiffs had been at Rochester on the 5th or 6th of August, and had agreed with Mack to make advances to him on corn to 38 cents per bushel on his furnishing shipping bills for the corn. The business was to be done on the part of the plaintiffs by James Chappel, their general agent at Rochester. Mack was to furnish the shipping bills to Chappel, who was to indorse Mack's drafts on the plaintiffs for the amount of the advance, which the plaintiffs were to accept and pay. . Advances to Mack in the same way had been made before. On Tuesday, the 8th of August, Mack presented to Chappel the two bills of lading, A and B, (Cuba and Neptune,) drew two bills on the plaintiffs, one for $1000 at 30 days, and one for $800 at 25 days, both payable to the order of Chappel, and both were indorsed by him on receiving the bills of lading, and the drafts were delivered to Mack. Mack passed the drafts to the Rochester City Bank. On the same day Chappel enclosed the shipping bills to the plaintiffs in New York. The two drafts were presented for acceptance, by the American Exchange Bank, and accepted by the plaintiffs on the 10th of August, (Thursday,) and were paid at maturity.

On Friday, the 11th of August, Bloss sought Niles and told him that he had sent shipping bills of the corn to Rochester to Mack, for whom he had bought the corn; that he had not received the money, and did not know what the matter was; that he had never been disappointed in receiving money, but had previously received it promptly in every instance. Niles said this was the first he had heard of Mack or of shipping bills; and he should sell the corn. Bloss asked him to wait until he could telegraph Mack and get an answer; and Bloss did telegraph him several times without getting any answer.

He then proposed that Niles or his clerk should go with him (Bloss) to Rochester, saying he would pay the expenses and get the money or give up the corn. Niles said Van Inwegen (his clerk) might go, and he went that day with Bloss to Roch-ester, where Bloss found that Mack had failed and left town on Thursday. On Saturday Van Inwegen telegraphed Niles that the corn was not paid for, and Mack had run away. Niles then sold the corn to P. Durfee & Co. at Buffalo. Durfee & Co. consigned the corn and delivered the bills of lading to Ar-thur H. Root. Root transferred them to Joseph H. Green, jun., the latter to Green & Mather, and they to L. W. Brai-nerd; and under these parties the defendant claimed to hold the property, and on demand made refused to deliver it to the plaintiffs. On Saturday afternoon Niles went to Rochester; went up the canal on Sunday and met three of the four boats, and gave them new bills of lading on account of P. Durfee & Co., care of Arthur H. Root, Albany. The Cuba had passed Rochester before he got there. He sent a like bill after her to be signed, which seems to have been done. The boats had all left Buffalo with bills of lading to M. M. Caleb & Co., N. York.

On Friday, the 11th August, when Niles was informed of the bills of lading to the plaintiffs, he telegraphed them as follows : " Ten thousand and ninety bushels corn, shipped by us on boats Cuba, Neptune, A. Beardsley and P. B. Langford, ac. I. F. Mack, to Dows & Cary, is not paid for. We notify you to consider and hold same for our account till further notice.                    NILES & WHEELER."

When the Cuba arrived in New York, the plaintiffs called on the defendant, the master, and demanded the corn, offering to pay charges. The defendant said he knew nothing about it, or had nothing to do with it; that he was obeying the or-ders of Mr. Caleb. He said a man had followed him and changed the bill of lading; that he believed it was originally shipped to Dows & Cary. The plaintiffs then brought re-plevin, and the property was re-delivered to the defendant, upon his undertakidg. For the purpose of showing the author-

Dows *v.* Rush.

ity of Walker to make bills of lading, the plaintiffs called James M. Hubbard, who testified that he had been in the forwarding business for ten years; knew Niles & Wheeler, who were also in the forwarding business, and also knew Walker; that Walker was *a clerk* of Niles & Wheeler, in August, 1848; "his business was in various branches, *but chiefly in making out bills of lading.*" The papers A, B and C, (the bills of lading in question,) were in the handwriting of Walker, and the signature was his; "the signature is Niles & Wheeler, per E. H. Walker;" I believe Walker was *in the habit* of signing that way; I have seen it before." "I have seen other bills of lading signed by Walker for Niles & Wheeler; had some myself; the bills now shown me are signed by him; I received them from Walker and paid the charges to him." Two such bills of lading were then produced and read, dated June 20 and July 6, 1848. These bills were of property shipped by Niles & Wheeler on the boats of the witness, and in those cases Niles & Wheeler were shippers and not carriers. The bills of lading in question, (marked A, B, C,) were then read in evidence without objection.

After the plaintiffs rested, the defendant moved for a nonsuit, 1. For want of evidence of authority of Walker to legalize exhibits A, B and C; 2. Because they were not bills of lading, and transferred no interest in the property; 3. Because they had not been duly assigned or transferred to the plaintiffs; 4. Because the plaintiffs had showed no title to or interest in the property in question. The court denied the motion, and the defendant excepted. The defendant called Niles, and the clerk Walker, for the purpose, among others, of disproving the authority of the latter to sign these bills of lading, and their evidence was in substance as before detailed. *Niles was the out door man* of the firm; and *Wheeler was not called.* The bills of lading were entered on the shipping books by Walker at the time they were delivered to Bloss, Monday August 7. Some alterations were made in them afterwards, and it does not distinctly appear that Niles & Wheeler had *actual* knowl-

Dows *v.* Rush.

edge of their having been issued until Friday, the 11th of August. The case being closed, the motion for a nonsuit was renewed, on the same grounds as before, and denied, and the defendant excepted. The court charged the jury that the evidence showed a sufficient authority or assent to bind Niles & Wheeler by the signature of Walker to the papers A, B and C, and that they, and the defendant under them, were estopped from denying, as against the plaintiffs, that they held the corn as Mack's agents and carriers on his account, at the time of the plaintiffs' advances on the faith of the receipts or shipping bills, and that the plaintiffs were entitled to recover the property. To which charge, and to each part thereof, separately and specifically, (so the case expresses it,) the counsel for the defendant excepted. The defendant's counsel also excepted to said charge on the ground that the question of sufficient authority or assent should have been submitted to the jury as a question of fact. The defendant's counsel then requested the judge to charge the jury that the plaintiffs were not entitled to recover damages beyond the amount of their advances, and interest thereon. His honor the judge refused so to charge, and to his refusal the counsel for the defendant excepted. The jury found a verdict for the plaintiff, and assessed the value of the property at $1621.21, and the plaintiff's damages for the detention thereof at $151.36. Judgment was entered upon the verdict, for $2559.64, damages and costs, and from this judgment the defendant appealed to the general term.

*John E. Burrill,* for the appellant. I. The title of the plaintiff rests wholly on the written instruments, A and C, and these appearing on their face to have been executed by a party purporting to act as the agent of Niles & Wheeler, the plaintiff was bound to inquire as to the extent of Walker's powers, and is chargeable with knowledge of those powers such as they turn out in fact to be. (*Dows* v. *Perrin,* 16 *N. Y. Rep.* 328.)

II. The act of Walker, if valid and binding on Niles & Wheeler, was in effect—1st. A transfer to Mack of 10,000 bushels of corn, belonging to Niles & Wheeler; and, 2d. An agreement to transport the corn to New York as carriers for him. And the plaintiff is not entitled to the corn unless he establishes the authority of Walker to do both of these things.

III. The evidence in the cause clearly showed that Walker had no authority to do these things. (1.) It is not denied that the corn was the property of Niles & Wheeler, the grain merchants. And it is not pretended that Walker ever had authority to sell or transfer the title to property belonging to Niles & Wheeler. (2.) As to the instruments regarded as agreements of Niles & Wheeler to transport and carry the property as carriers for Mack. The evidence given by the plaintiff was that of Hubbard, who testified that Walker had signed shipping lists for Niles & Wheeler for property *shipped by them* on his, Hubbard's, boats, but he had never known Walker to sign bills for Niles & Wheeler for property shipped on their own boats. In such cases, Niles & Wheeler were *shippers*, and not carriers. The evidence on the part of the defendant showed that Walker had no special authority to sign the paper procured by Bloss, and that he had never signed papers of a like character. That the only papers he had ever signed were in cases where Niles & Wheeler had, as forwarders, received freight which came down the lake, and which they shipped by lines *other than their own* to places along the canal. That the papers spoken of by Hubbard were of that character, and were delivered to the captains or owners of the line to enable them to comply with the statute as to clearances. (1 *R. S.* 240, §§ 121, 2.) That he had never signed papers where property was destined for New York, nor where the effect was to transfer the property of Niles & Wheeler, or to authorize its transfer, unless he had unconsciously done so in the present instance. It has been repeatedly decided that papers of that character do not operate upon the *title* to prop-

erty. (*Ackerman* v. *Humphrey*, 1 *Carr. & Payne*, 309. *Tucker* v. *Humphrey*, 4 *Bing.* 516.)    The court of appeals has decided in *Dows* v. *Perrin*, on the same facts, that Walker's execution of the instruments in question was beyond the scope of his agency.

IV. Under the circumstances, however, the judge erred in charging the jury that the evidence showed a sufficient authority or assent to bind Niles & Wheeler by the signature of Walker to the papers.    The least that could have been granted, under the circumstances, would have been to leave the question to the jury, under proper instructions.    But even conceding that Walker had authority to sell the property of Niles & Wheeler, and to make contracts for the transportation of property actually shipped on their boats, the plaintiff was not entitled to recover.

V. Mack acquired no title to the corn, as against Niles & Wheeler, nor any right to sell it, he being a party to the instruments, affected by the fraud of Bloss, and being obliged to claim directly through and adopt the fraudulent acts by which Bloss procured such instruments. (*Dows* v. *Perrin*, *supra. Covill* v. *Hill*, 2 *Seld.* 374.)    (1.) The proof shows that there was, in fact, *no sale or agreement for the sale* of the corn made between Niles & Wheeler and Bloss.    (38 *Eng. Law and Equity*, 582.)    (2.) Bloss knew that Walker had no authority to sign the pretended bill of lading, especially if they purported to affect the *title or possession* of the corn. (3.) Bloss knew, moreover, that Niles & Wheeler did not *intend* to part with the title or possession of the corn, or confer on him or Mack any power over it.    (4.) Mack's position as to title was precisely the same as if he had *personally* committed the fraud by which Bloss obtained the signature to the pretended bill of lading. (*Dexter* v. *Adams*, 2 *Denio*, 646. *Hawkins* v. *Appleby*, 2 *Sandf. S. C. R.* 421. *Olmsted* v. *Hotailing*, 1 *Hill*, 317, 318. *Selden's Notes, Dec.* 1853, *p.* 80. 7 *East*, 164–166, *Ld. Ellenborough, Ch. J.*)    (5.) If these papers purported to divest the title or possession of Niles &

Dows *v.* Rush.

Wheeler, Mack was in the condition of one who claims by fraud, not only, but through a felony. (*Barb. Crim. Law,* 124 *to* 130, 2*d ed. Andrews* v. *Dieterich,* 14 *Wend.* 31, 34 *to* 37. *Hoffman* v. *Carow,* 20 *id.* 21.) (6.) But if Bloss's act amounted to *fraud* simply, and not to a felony, it clearly gave Mack no title to the corn, nor any authority to sell or interfere with it. (1 *Smith's Lead. Cases,* 543, *et seq., note* 43, *Law Lib.* 3 *Comst.* 381, 382, *Ruggles, J. Williams* v. *Merle,* 11 *Wend.* 80, 81. *Cary* v. *Hotailing,* 1 *Hill,* 311. *Olmsted* v. *Hotailing, Id.* 317. *Andrews* v. *Dieterich,* 14 *Wend.* 31, 34. 38 *Eng. Law and Eq.* 582.) (7.) The court of appeals decided in *Dows* v. *Perrin,* that Mack had no right of property in the corn, and that his pretended purchase through Bloss was void on account of fraud. (*Opinion of Denio, citing Brower* v. *Peabody,* 3 *Kern.* 126.)

VI. Assuming that the pretended bills were regular on their face, the delivery of such *bills* to the plaintiff transferred no interest *in the corn,* for the reason that Mack had not any interest which he could transfer as against Niles & Wheeler, the owners. (*See fifth point.*) (1.) One whose attempt to control the custody of goods would be *tortious* as against the owner, cannot transfer them *by a bill of lading fraudulently obtained.* (1 *Smith's Lead. Cases,* 543, *et seq. note. Blackb. on Sales,* 279 *to* 289, *Law Lib.* 1 *H. Black. R.* 359 *to* 362, *Ld. Loughborough. Gurney* v. *Behrend,* 3 *Ellis & Blackb.* 622, 633, 634. 3 *Kern.* 628, 629, *Comstock. J. Covell* v. *Hill,* 2 *Seld.* 374. 1 *Smith's Lead. Cases,* 890, *Phil. ed.* 1855. *Osey* v. *Gardner,* 1 *Holt's N. P. R.* 405. 6 *East,* 41, *Ld. Ellenborough. Thompson* v. *Doming,* 14 *Mees. & Wels.* 402. 38 *Eng. Law and Eq.* 582.) (2.) The validity of such transfers is not recognized except where the assignor has at the time some right or authority *operative as against the owner until rescinded.* (1 *Smith's Lead. Cases,* 543, *et seq. note. Blackb. on Sales,* 285–289. 3 *Ellis & Blackb.* 622, 633, 634. 38 *Eng. Law and Eq.* 582. 3 *Kern.* 628, 629, *Comstock, J. Covill* v. *Hill,* 2 *Seld.* 374. 6 *East,* 41, *Ld.*

*Ellenborough. Osey* v. *Gardner,* 1 *Holt's N. P. R.* 405. *Court of Appeals, Denio* v. *Perrin, Denio, J.*) (3.) Mack having got the pretended bills of lading contrary to the owners' consent, the plaintiff is not aided by the statute relating to principals, factors, &c. (1 *R. S.* 774, § 1. *Covill* v. *Hill,* 2 *Seld.* 374. 3 *Ellis & Blackb.* 622, 623.) (4.) Besides, Mack, according to the claims of the plaintiff, is the *consignee* of the corn, and the case is not within the reach of the principal and factor's act. (5.) Moreover, the owners *actually shipped the corn in their own name,* and the plaintiff does not even pretend that Mack was intrusted with the bills or corn as agent, but as *vendee.* (*Covill* v. *Hill,* 2 *Seld.* 374. 49 *Eng. Common Law Rep.* 673, 700, 701, *Tindall, Ch. J.*) (6.) The bills having been obtained by Mack through the fraud or felony of his agent, the transfer of them to the plaintiff could not confer on the latter any right as against the true owners. (*Barb. Crim. Law,* 134–138, 2d ed. 14 *Wend.* 31, 35–37. 20 *id.* 21. 3 *Ellis & Blackb.* 622, 633, 634. 3 *Kern.* 628, 629. 2 *Seld.* 380, *Gridley, J. Brower* v. *Peabody,* 3 *Kern.* 121. 1 *Holt's N. P. R.* 405.) (7.) The court of appeals in *Denio* v. *Perrin,* decided, "*that when a bill of lading is obtained by fraud from the owner of the goods, a bona fide indorsee or transferee has no better title than the transferer had.*"

VII. The pretended bills of lading, however, were documents so unusual and irregular on their face, that every one who saw them would know that they were not given in the ordinary course of business, and the plaintiff therefore acquired no better title under those than Mack. (1.) They did not purport to be bills of lading in any sense; one of them being a single paper, relating to four separate shipments in four separate vessels and, all lacking the *signatures of the masters.* (*Covill* v. *Hill,* 2 *Denio,* 323, 330, 1; *S. C.* 2 *Seld.* 374, 375. 1 *T. R.* 217, *Buller, J.* 3 *Kent's Com.* 268, 7th ed. *Bouv. Law Dic. title Bill of Lading.* 1 *Jacob's Law Dic. title Bill of Lading.* 1 *Bouv. Inst.* 353, 354.) (2.) The plaintiff is there-

fore chargeable with knowing that *regular bills were out-standing*, controlling the possession and final destination of the corn. (1 *R. S.* 240, §§ 121–124. *Ross on Commercial Law*, 161, 162, *Law Lib.* 1 *Smith's Lead. Cases*, 550, *note. Law Lib. No.* 43. *Craven* v. *Rider*, 6 *Taunt.* 433. *Jenkyns* v. *Osborne*, 7 *Man. & Granger*, 698. 1 *Smith's Lead. Cases*, 900, *note, Phil. ed.* 1855. 5 *Barn. & Adol.* 313, 316, *Denman, Ch. J. Conrad* v. *Atlantic Ins. Co.* 1 *Peters' Rep.* 387. *Caldwell* v. *Ball*, 1 *T. R.* 205, 214, 212. 16 *Pick.* 476, *Shaw, Ch. J. Bank of Poughkeepsie* v. *Hasbrouck*, 2 *Seld.* 216.) (3.) The plaintiff knew also that these pretended bills were not transferable, as a *symbol of property or possession*, there being no words of *negotiability* in them. (*Ackerman* v. *Humphrey*, 1 *Carr. & Payne*, 53. *Tucker* v. *Humphrey*, 4 *Bing.* 566. *Ross on Commercial Law*, 151, 152, *Law Lib. Jenkyns* v. *Osborne*, 7 *Man. & Granger*, 698. 1 *Smith's Lead. Cases*, 605, *Phil. ed.* 1855. *Abbott on Shipping*, 397, 398, *Boston ed.* 1846. *Blackb. on Sales*, 275. 2 *Kent's Com.* 722, 725, 7th ed.) (4.) The judge, however, erred in taking away from the jury the question of the *bona fides* of the plaintiff, as he did by charging that the plaintiff was entitled to a verdict. (*See preceding subd. of this point. Byles on Bills*, 23, *Phil. ed.* 1853. *Nixon* v. *Palmer*, 4 *Sel-?.* 398.)

VIII. The court erred in charging the jury that the evidence showed a sufficient authority or assent to bind Niles & Wheeler by the signature of Walker. The court also erred in charging the jury that *Niles & Wheeler* were estopped from denying that they held the corn as Mack's agents and carriers on his account. (1.) Because Walker had no authority to make any contract for the carriage of the corn. (*Supra.*) (2.) The doctrine of estoppel is wholly inapplicable, especially as the papers were not designed or intended to facilitate transfers by Mack, or to be acted on by his *assigns.* (*See* 7th *point and subdivisions.* 3 *Kern.* 600, 638, 639, *Comstock, J. Freeman* v. *Cooke*, 2 *Exchequer Rep.* 654. *How-*

*ard* v. *Hudson,* 2 *Ellis & Blackb.* 1.    *Cowles* v. *Bacon,* 21 *Conn. Rep.* 451.)

IX. The court erred in charging the jury that the plaintiffs were entitled to a verdict for the property.    (1.) There being no written evidence of authority of Walker, its extent was to be inferred from the testimony, and the defendant was entitled to have the jury pass upon it.    (2.) By said charge, the judge took away from the jury the question of the *bona fides* of the plaintiffs, which bore not only upon the plaintiffs' title, but also upon the estoppel.    (3.) All the matters set out in the seventh point, entered into the question of the plaintiff's good faith, and should all have been submitted to the jury.

X. The defendant in this action was the master of the vessel on board of which the corn was shipped; and under the facts proved, was not estopped by any act of Niles & Wheeler.    (1.) As such master, he had executed a regular bill of lading, acknowledging the receipt of the corn, and agreeing to deliver it to the consignee therein, and was bound to deliver it accordingly.    (2.) The consignee having taken possession of the corn at Albany, the defendant, though still retaining possession of the corn, acted as the bailee of the consignee, and was not the agent of Niles & Wheeler. (3.) Having given his receipt for the property and *contracted* to deliver it to the consignee, the captain, so far as such property is concerned, has a distinct individuality and *becomes a principal*.    (4.) Niles & Wheeler themselves could not have recovered the possession of the property on the mere production of the bill of lading under which the plaintiff claims. (5.) Niles & Wheeler could not have taken from the defendant the property for which he had signed a bill of lading, nor could they authorize any one else to do so; nor could their statements or declarations affect the defendant.    (6.) The papers under which the plaintiff claims are not executed by the defendant; nor is he in any way a party thereto; and so

Dows *v.* Rush.

far as he is concerned, they are the mere declarations of Niles & Wheeler, and he should not be estopped thereby.

XI. The title of Durfee & Co. and their assignees to the corn in suit, was superior to that of the plaintiff. (1.) The plaintiff acted on papers which neither did nor could transfer the actual possession of the corn, unless Mack had the rightful possession as against Niles & Wheeler. (*Phillip* v. *Huth*, 5 *Mees. & Wels.* 596. 49 *Eng. Com. Law*, 698. 27 *id.* 90, 91. *Ross on Commercial Law*, 151, 152. 1 *Smith's Lead. Cases*, 543, *et seq. note; also see points* 5, 6, 7. (2.) The plaintiff took from one who had neither the actual possession nor the customary symbol of it; and acquired no apparent legal title, but a mere equity, subject to prior rights, and to be overthrown by a legal title. (*Point 5. Vattier* v. *Hinde*, 7 *Peters*, 271. *Boone* v. *Chiles*, 10 *id.* 212. *Beekman* v. *Frost*, 18 *John.* 544. *Wheeler* v. *Ginley*, 20 *Pick.* 545. 1 *Smith's Lead. Cases*, 543, *supra*.) (3.) On the other hand, Durfee purchased from the party having possession of the property, and received the usual, ordinary and customary bills of lading, acknowledged by the master, and they were in turn duly and formally assigned and transferred.

XII. The court erred also in refusing to rule that the plaintiff's recovery should be limited to the advances and interest. (1.) The plaintiffs were obviously not *bona fide* purchasers in any sense, except to the extent of their actual advances to Mack, *i. e.* 38 cents per bushel. (*Ross on Commercial Law*, 150, *Law Library Eq. In re Westzinthus*, 8 *Barn. & Adol.* 817. *Spaulding* v. *Beavan*, 6 *Beav.* 380.) (2.) The plaintiffs have actually recovered by the erroneous ruling of the judge for a greater amount than their advances, without any allowances for freight or charges.

*G. C. Bronson*, for the plaintiff. I. The instrument in question, though not in the form commonly employed where the shipment is by sea, is, by the settled usage in our inland trade, a bill of lading, with all the force and effect which

properly belong to bills of lading. (*Dows* v. *Perrin*, 16 *N. Y. Rep.* 325, 328, 9. *Gibson* v. *Stevens*, 8 *How.* 384. *Bank of Rochester* v. *Jones*, 4 *Comst.* 497. *Dows* v. *Green*, 16 *Barb.* 72. 3 *Kent*, 207. *Abbott on Shipping*, 218, ed. of 1822, by *Story*. *Grove* v. *Brien*, 8 *Howard*, 429.)

II. The authority of Walker to act as the clerk or agent of Niles & Wheeler in making the bill of lading, was abundantly established in the first instance; and there was nothing in the subsequent proofs to controvert that evidence—at least so far as third persons are concerned. (1.) The authority of Walker was so fully established in the first instance, that no objection was made against reading the bill of lading in evidence. Walker was *the clerk* of Niles & Wheeler, and made and signed other bills of lading, some of which were delivered to the witness Hubbard. " His business was in various branches, but *chiefly in making out bills of lading*." (2.) The defendant afterwards attempted to answer our evidence by calling Niles and Walker. If their evidence, when fairly interpreted, does not tend to confirm our proofs, it clearly is not in conflict with the evidence given by the plaintiffs. There was nothing like a serious conflict between the evidence given for the defendant, and that on the part of the plaintiffs; and the judge was clearly right in telling the jury that " the evidence showed a sufficient authority or assent to bind Niles & Wheeler by the signature of Walker to the papers." Whatever might be the conclusion if the controversy was between the principals and the agent, it is entirely clear that third persons, having no notice to the contrary, might safely regard Walker as the duly authorized clerk or agent of Niles & Wheeler to make bills of lading in their names and business. Even had they given the clerk special instructions not to act in a particular class of cases, it could not affect third persons who had no notice of such instructions.

III. Although the bill of lading, in the events which followed, had the effect of transferring the property without payment, that fact can have no just bearing upon the question of

authority to make the instrument. (1.) The authority does not depend upon the consequences which resulted from its exercise; and if there had been no previous agreement by Niles & Wheeler to sell the grain, they would be bound by what their agent did in the usual course of his employment, whatever those consequences may be. (2.) But Niles & Wheeler had previously contracted both for the sale of the corn, and its transportation to New York; and the bill of lading was made for the purpose of carrying the contract into effect. (3.) The question is not whether the clerk had authority to sell the corn, but whether he had power to make the bills of lading. (4.) Although Niles & Wheeler intended to keep possession of the corn until it was paid for, their failure to do so cannot affect the question of authority to make the bill of lading. Clearly want of diligence in securing their rights, whether a fault of their own or of their agents, cannot affect the validity of the transaction as against third persons, who have acquired rights under the bill of lading. (5.) We say with great respect, there was a manifest fallacy in the reasoning of the judge on this subject in *Dows* v. *Perrin*, (16 *N. Y. Rep.* 325.) But it is enough that this is a very different case *in its facts* from that against Perrin.

IV. Although no one can doubt that Walker had authority to make the bill of lading, the plaintiffs have no occasion to maintain what has been said in the *second* and *third* points. This is not a case, but a *bill of exceptions*, and the exception is to the charge of the judge. What he said on this subject, and all he said, was "that the evidence showed a sufficient authority or assent to bind Niles & Wheeler by the signature of Walker to the papers A, B and C." In this the judge was clearly right. But if he was wrong, it was only a *comment upon evidence*, and for that a bill of exceptions will not lie. (1.) A bill of exceptions must be upon some *point of law* either in admitting or rejecting evidence, or a challenge, or some *matter of law* arising upon facts *not denied*, in which the party is overruled by the court. It does not draw the

whole matter into examination, but only the particular point
to which it is directed. There is no precedent for reviewing
on a *bill of exceptions* what the judge may have said *by way
of comment upon evidence*. (*Buller's N. P.* 316. *Carver* v.
*Jackson*, 4 *Peters*, 1. *People* v. *Vane*, 12 *Wend.* 78. *Jack-
son* v. *Timmerman*, *Id.* 299. *People* v. *White*, 14 *id.* 111.)
(2.) Had the defendant thought proper, he might have re-
quested the judge to submit the question of authority to the
jury ; but no such request was made. *He did request* the
judge to charge on *another question*, and would undoubtedly
have asked the submission of this question, but for the convic-
tion that no jury could hesitate for a moment to find for the
plaintiffs. But whatever the reason, it is enough that the
request was not made. (3.) It is further stated that the de-
fendant also excepted to said charge on the ground that the
question of sufficient authority or assent "*should have been*
submitted to the jury as a question of fact." That was not
*a request to leave* the question to the jury, but only a com-
plaint that it *had not been done.*

V. Full effect must be given to the fact, now established,
that the bill of lading was made by authority of Niles & Wheeler,
and then the case comes to this : *they parted with the possess-
ion of the property under a contract of sale,* and though, as
against Mack, they might have rescinded the contract, and
reclaimed the property on the ground of fraud on his part,
they could only do so by acting *before third persons had ac-
quired rights in the property under him. As they did not
act until after the plaintiffs had become bona fide purchasers
for value under Mack,* the title of the plaintiffs cannot be
impeached. Had Mack obtained the property by *larceny* or
*robbery,* he could not, as against the owners, confer a good
title upon any one. But it is otherwise where the owner *vol-
untarily parts with the possession of the property,* though
induced by fraud, either 1, under a contract of sale ; or 2, with
the usual *indicia* of ownership, or authority to sell. In such
cases the person having the apparent right to sell, though he

obtained it by fraud, or acts fraudulently, may confer a good title by a sale made before the true owner has rescinded the original transaction. A sale brought about by the fraud of the vendee is *not absolutely void,* but only voidable at the option of the vendor. He may elect to confirm or to rescind the contract. But he cannot rescind after a third party has purchased from the fraudulent vendee, for the reason that when one of two innocent persons must suffer by the fraud of a third, the loss shall fall on him who enabled the third to do the wrong. (*Mowrey* v. *Walsh,* 8 *Cowen,* 238. *Root* v. *French,* 13 *Wend.* 570. *Rowley* v. *Bigelow,* 12 *Pick.* 306. *Everett* v. *Saltus,* 15 *Wend.* 474, 476, 7; 20 *id.* 267, *S. C.;* 272, *per Ch. Walworth;* 275–280, *per Senator Verplanck. Pickering* v. *Busk,* 15 *East,* 38. *Kingsford* v. *Merry,* 34 *Law and Eq. Rep.* 607, 610. *Keyser* v. *Harbeck,* 3 *Duer,* 373. *Brower* v. *Peabody,* 18 *Barb.* 599; 3 *Kern.* 121, 126, *S. C. Parker* v. *Patrick,* 5 *T. R.* 175. *Load* v. *Green, per Parke, B.* 15 *Mees. & Welsb.* 219. *White* v. *Garden,* 5 *L. and Eq. R.* 379. *Stevenson* v. *Newnham,* 16 *id.* 401, 408.) It will be seen by the last six references, that this rule has been carried so far that one who has obtained the goods by *false pretenses,* amounting to a *statute felony,* can confer a good title, either by selling or *pawning* the property. It will be further seen that *Parker* v. *Patrick,* though doubted by Denman, C. J., in *Peer* v. *Humphry,* (2 *Ad. & El.* 495,) has since been fully confirmed. Though the principle is undoubtedly sound, there is no occasion to go so far in this case; for Mack committed no criminal offense of any kind. His only sin was in not remitting the money to pay for the corn, after obtaining it from the plaintiffs. It may be proper to remark, before leaving this point, that there was no intentional wrong whatever on the part of Bloss, who negotiated the purchase for Mack.

VI. The corn having been consigned to the plaintiffs, and they having advanced money on receiving the bill of lading, and without notice of any fraud on the part of Mack, the right of Niles & Wheeler to stop the goods *in transitu* was at an

end. (1.) It has been settled for nearly three-quarters of a century that a bill of lading, like a bill of exchange, is in its nature a *transferable* instrument, and that the transfer of the symbol carries the property with it, and puts an end to the right of the consignor to stop the goods on the insolvency of the vendee. (*Lickbarrow* v. *Mason*, 2 *T. R.* 63; 6 *East*, 22, *note;* 5 *T. R.* 683; 1 *H. Black.* 357, *S. C.*) Also mentioned, 2 *H. Black.* 211; 5 *T. R.* 367; 1 *Peters*, 386, 444, 5; *Conrad* v. *Atlantic Ins. Co.* There has been some debate in the books on the question whether the instrument is *negotiable* to all intents and purposes, so that the indorsee will acquire *all the rights* which are acquired by the indorsee of a bill of exchange. And it has been said that, though the negotiation of a bill of lading transfers the property, it does not give the indorsee a right of action on the bill. (*Dixon* v. *Bovill, per Ld. Ch. Cranworth*, 39 *L. and Eq. Rep.* 52.) However that may be, it is entirely clear that a bill of lading is negotiable for the purpose of passing not only the instrument itself, but the property to which it relates; just as the negotiation of a bill of exchange carries not only the bill, but the debt which it secures. The transfer of the symbol is just as effectual as handing over the property itself. The case, then, plainly falls within the principle asserted in the *fifth* point, and the authority cited in its support. A fraudulent vendee can confer a good title on a *bona fide* purchaser from him; and if he may do that by delivering the property itself, no good reason can be assigned why he may not do the same thing in another way, to wit, by transferring the bill of lading, which has the legal effect of passing the property. (2.) If the English courts are not chargeable with a retrograde movement on this question, they have, to say the least, failed to keep pace with the advance of commerce and the wants of a commercial and trading people. They have said, if not adjudged, that it is not enough that the consignee, factor, or other person holding the bill of lading or other *indicia* of ownership, has the apparent right to sell, but he must also, as between him-

Dows *v.* Rush.

self and the consignor, have the actual right to transfer the property. In other words, that the usual documentary evidence of title, or the right to sell, may be effectually overcome, and the title of an indorsee of the bill of lading or other document, be defeated by some private matter or instructions between the original parties, of which third persons had no notice. In this state of things, so injurious to trade and commerce, parliament interfered, and by several enactments, brought the law up to the usage among merchants, factors, and other agents, and the wants of the commercial world. (3.) In this country the courts have not followed the errors which made legislation necessary in England, but have adapted old principles to the present advanced state of trade and commerce, and the usual course of business in this country. (*Gibson* v. *Stevens*, 8 *How.* 384, 398, 400. *Rowley* v. *Bigelow*, 12 *Pick.* 306. *Bank of Rochester* v. *Jones*, 4 *Coms.* 497. *Grove* v. *Brien*, 8 *How.* 429. *Dows* v. *Greene*, 16 *Barb.* 72. *Brower* v. *Peabody*, 18 *id.* 599.) True this judgment was reversed (3 *Kern.* 121, 126,) but it was on the ground that the goods were obtained by *larceny*, and not merely by fraud. (*Dows* v. *Perrin*, 16 *N. Y. Rep.* 325.) What was said in this case about the negotiability of bills of lading was founded on the English decisions, which no longer give the rule in that country; and, besides, was but *dicta*, the case having before been disposed of on other grounds, and, of course, neither binds that court nor any other. (4.) On the facts, as they must now be taken to be fully established, Niles & Wheeler, the owners of the corn, shipped it on account of Mack, and consigned it to the plaintiffs, who paid their money on the faith of the consignment; and it is impossible to maintain that Niles & Wheeler, (or any person claiming under them,) can defeat the rights thus acquired, by alleging that they were induced to act by the fraud of a third person, of which fact the plaintiffs had no knowledge at the time they received the bill of lading and parted with their money.

VII. Whatever conclusion the court may reach on the *com-*

*mon law* doctrine, which has been considered in the fifth and sixth points, the case plainly falls within, and the plaintiffs are protected by, the 1st and 2d sections of the *factor act* of 1830. (*Laws of* 1830, *p.* 203, §§ 1, 2. 2 *R. S.* 59, 3*d ed.; Id.* 184, 4*th ed.*) (1.) The property was shipped in the name of Mack, and consigned to the plaintiffs, who made an advance upon it to Mack, without notice, by the bill of lading or otherwise; that Mack was not the actual and *bona fide* owner of the property. The case is not only within the very words of the act, but is just as plainly within the spirit and policy of the enactment. If the act is not of still wider application, it was clearly designed to protect the consignee in a case like this. To say that the legislature meant less than that, is, in effect, to say that they meant nothing. This question was not touched, or even alluded to in *Dows* v. *Perrin.* (2.) The cases which have been decided upon the *third* section of the factor act have nothing to do with the present inquiry. (*Stevens* v. *Wilson*, 6 *Hill*, 512; 3 *Denio*, 472, *S. C. Covill* v. *Hill*, 4 *id.* 323; 1 *Comst.* 522, *S. C.;* 2 *Seld.* 374, *S. C. Zachrisson* v. *Ahman*, 2 *Sandf.* 68.) The *first* and *second* sections of the act were made for the protection of the *consignee*, who has made advances to the person in whose name the shipment was made. The *third* section was made for the protection of those who have dealt with *the factor, or other agent*, who has been intrusted with the bill of lading, or other documentary evidence of title.

VIII. There was nothing in the objection that the recovery of damages should be limited to the amount of the plaintiffs' advances. The plaintiffs brought replevin, and the sheriff took the property, whereupon the defendant procured a redelivery, pursuant to the statute. (1.) The plaintiffs were entitled either to the corn itself, or damages to its full value, as *consignees* of the property. (2.) To the extent of their advances the plaintiffs were *purchasers*, and the legal title to the property vested in them to protect their advances. (*Gibson* v. *Stevens*, 8 *Howard*, 384, 400.) (3.) The equitable in-

terest in the surplus beyond the advances, does not affect the legal title to the property, which is in the plaintiffs. (4.) That equitable interest, is either in *Mack, Niles & Wheeler*, or *Brainard;* and if the plaintiffs get more than an indemnity, they must account to one or the other of those persons for the surplus. (5.) The defendant Rush is not entitled to the surplus, beyond advances, for two additional reasons—1st. The equitable interest is not, and never was, in him; and 2d. He has not set up any counter-claim in the answer, but relied wholly upon title out of the plaintiffs for his defense. (*Code,* §§ 149, 150.)

IX. Every thing in the motions for a nonsuit is covered by what has already been said, and the judgment of the special term should by affirmed with costs.

*By the Court,* HOGEBOOM, J. As counsel differ entirely as to what questions are open for debate in this case, it will be necessary to look at that point in the first place, in order that we may not waste our time in needless discussion. This is a bill of exceptions, and of course no questions arise save those which are presented upon exception. I find in the case, on the part of the defendant, only an exception on the refusal to nonsuit, repeated at the end of the case, exceptions to the charge and the refusal to charge, and an exception to the rule of damages laid down by the court. These present the only questions which the parties have brought here for examination. I think the exception to the refusal to nonsuit may be very briefly disposed of. By the statement hereto prefixed it is apparent there were facts enough proved to go to the jury on the questions embraced in the motion to nonsuit. Any thing more that needs to be said upon those questions may be just as properly presented in considering the exceptions to the charge. We come then to the charge of the court. The court charged 1st. That the evidence showed a sufficient authority or assent to bind Niles & Wheeler, by the signature of Walker to the papers A, B and C, (the alleged bills of

lading.) This, I think, is nothing more than a statement of the evidence, or comment upon it, or its effect, or an assumption of a fact in the cause. It is a mere reference to what is established by the evidence. Now it is quite clear that none of these things are the grounds of exception. (*Jackson* v. *Packard*, 6 *Wend.* 415. *Jackson* v. *Timmerman*, 12 *Id.* 299. *Nolton* v. *Moses*, 3 *Barb.* 31. *Barnes* v. *Perine*, 2 *Kern.* 22, 23. *Beekman* v. *Bond*, 19 *Wend.* 444. *People* v. *Cook*, 4 *Seld.* 78. *Hunter* v. *Trustees of Sandy Hill*, 6 *Hill*, 410.)

A party who is dissatisfied with the expression of an opinion by a judge upon a question of fact, or the conclusion at which he arrives in regard to it, must express that dissatisfaction; not by excepting to the charge of the judge on that point, but by asking to have the question of fact submitted to the jury for their determination. The defendant's counsel claims to have done so in this case, but I think he did not. He simply excepted to the *charge*, on the ground that the question of sufficient authority or assent should have been submitted to the jury as a question of fact. The judge had made no charge to the contrary of this, and there was nothing therefore to which to except; nor had he been *requested* to submit the question to the jury; nor had he *refused* to do so. If he had so refused, the proper exception would have been to *such refusal*. Nor do I think that this *exception* was equivalent to a *request* to the court so to submit, and a *refusal* to do so. It would be torturing language to give it that effect. The most that can be said for it is, that perhaps it ought to be regarded as an exception to what the judge did say upon the subject of sufficient authority as being tantamount to withdrawing it from the judge, although that would be construing language in a rather latitudinarian way. But so construed it is unavailable; for the judge had done no such thing. I am quite aware that this may be argued to be a technical and severe application of the rules of practice, and tending to defeat practical justice. Nevertheless, I understand this practice to be

Dows *v.* Rush.

well settled and firmly established, and I am by no means sure that the rights of parties will not be quite as well guarded, if the judge who presides at the circuit has his attention invited to the precise thing wanted, or objected to, and the court which reviews his decision is clearly and distinctly apprised of the precise thing which was done on the trial. We are, therefore, to regard these exceptions as out of the case, and as if the judge was justified in the comments he made upon the effect of the evidence. Only two exceptions besides that on the rule of damages remain, to wit: to so much of the judge's charge as states that Niles & Wheeler, and the defendant under them, were estopped from denying, as against the plaintiff, that they held the corn as Mack's agents and carriers, on his account, at the time of the plaintiffs' advances on the faith of the receipts or shipping bills; and to so much of the charge as states that the plaintiffs were entitled to recover the property. It is not quite apparent that these are distinct propositions and not to be read together, and dependent the last upon the first; or that if they are to be treated as distinct, the defendant has made a distinct and separate exception to the three branches of the charge; the two now under consideration and the one previously considered. Clearly a *general* exception is of no avail; the first part of the charge being unexceptionable. (*Murray* v. *Smith*, 1 *Duer*, 412. *Jones* v. *Osgood*, 2 *Seld*. 233. *Carpenter* v. *Stilwell*, 1 *Kernan*, 61.) So, also, the courts have repeatedly held that an exception to the charge, and to each and every part thereof, raises but a single exception to the entire charge, and is unavailable if any portion of it be correct. (*Auth. last cited. Lansing* v. *Wiswall*, 5 *Denio*, 213. *Caldwell* v. *Murphy*, 1 *Kern*. 416.)

Perhaps the defendant has saved his exception and made it distinct by saying that he excepted to the charge, "and to each part thereof, *separately and distinctly.*" (*Dunckel* v. *Wiles*, (1 *Kern*. 428.) But that is not quite clear. The more appropriate way certainly would have been to have kept

the several parts of the charge designed to be excepted to "separate and distinct" from each other, and to have applied the exceptions separately to each separate portion, and then there would have been no confusion or doubt. I shall treat the case, however, as if these exceptions were in point of form and regularity sufficient.

Then were Niles & Wheeler and the defendant *estopped* from denying as against the plaintiff that they held the corn, as Mack's agents and carriers, on his account?

We must now assume that the shipping bills, receipts or bills of lading, whatever they may be properly termed, were executed by Niles & Wheeler, and came properly and in good faith into the hands of the plaintiffs. I discover no evidence which, as to the latter, impeaches the *bona fides* of the transaction. The judge undoubtedly assumed that fact in announcing the rule of law which we are now considering. And I think (that being sufficiently apparent) the defendant, if he was dissatisfied, should by specific requests have asked him to discriminate or charge specifically upon the several particulars which together made up the legal proposition which he put forth. (*Barnes* v. *Perine*, 2 *Kern.* 22.)

Assuming then that the instruments in question were properly executed, by the owners of the corn, and delivered in good faith to the plaintiffs, who made advances thereon, were they and the defendant, as the master of the boat and their agent, estopped from denying, as against the plaintiff, that they held the corn at the time of the advances as Mack's agents and carriers? In other words, was the title of Niles & Wheeler under the facts proved, such as could be set up against the title of the plaintiffs? for that, I think, was the legal proposition which the judge meant to announce, and not a general abstract proposition having no reference to the facts of the case, whether a party who has once delivered a bill of lading is forever estopped from impeaching it under any circumstances whatever.

To determine this question, let us look briefly at the facts.

The paper, though informal, was essentially a *bill of lading.* Such has been expressly decided to be its character, in the case of *Dows* v. *Perrin,* (16 *N. Y. Rep.* 328, 9.) Such also is the liberal interpretation given to papers of a nearly similar character in other cases. (*Dows* v. *Greene,* 16 *Barb.* 72. *Bank of Rochester* v. *Jones,* 4 *Comst.* 497.) And it has this peculiar feature: it is not only signed by the owner of the shipping boat, but by the *owner of the goods* or the *vendor* to Mack, under an executory contract of sale. On its face, therefore, it is a certificate from Niles & Wheeler in both of these capacities that the corn was shipped on account of Mack— that is for his benefit, and I think it fairly means for his benefit as the *purchaser and owner of the goods*—to the plaintiffs themselves, as consignees. I think also the fair effect of the evidence of Bloss and Walker is that the bills of lading were delivered to Bloss intentionally and voluntarily without deception or fraud; and therefore that he had lawful possession of them. When he sent them, therefore, to Mack, Mack had lawful possession of them with the consent of the former owners and as apparent owner himself. He had through the bill of lading, the constructive—the legal possession; for it can scarcely be disputed that according to the commercial law the possession of this document of title was equivalent to the possession of the property itself, so far as respects the use thereafter made of it; and the transfer of the one was the transfer of the other. (*Lickbarrow* v. *Mason,* 2 *T. R.* 63. *Conrad* v. *Atlantic Insurance Co.,* 1 *Peters,* 386. *Bank of Rochester* v. *Jones,* 4 *Comst.* 497. *Dows* v. *Greene,* 16 *Barb.* 72. *Brower* v. *Peabody,* 18 *Barb.* 599.) It is not necessary to discuss the question whether if this bill of lading did not represent an actual shipment of goods, or if its possession was obtained by fraud, it would destroy the plaintiff's case; for I think neither of these questions arise; nor does it seem to be material to consider whether the execution of the bill of lading *preceded* in point of time the actual shipment of the goods, so long as it represented a real transaction. Were not the

plaintiffs, then, when on the 8th of August they received in good faith and for advances actually made, the transfer of the bill of lading and of the goods, and in substance the pledge or mortgage or sale of the latter as the security for those advances, brought within the protection of that rule of law which prefers the title of a bona fide purchaser from a fraudulent vendee to that of the original owner. (*Mowrey* v. *Walsh*, 8 *Cowen*, 238. *Root* v. *French*, 13 *Wend.* 570. *Keyser* v. *Harbeck*, 3 *Duer*, 373. *Saltus* v. *Everett*, 20 *Wend.* 267.) In the latter case the chancellor says, at page 272 : "If the owner of the goods had caused the bill of lading to be made out in the name of Collins, (the alleged fraudulent assignor of the bill,) so as to give him a prima facie right to the goods as owner or consignee for his own benefit, a bona fide purchaser might have been entitled to protection." Up to the time when Mack transferred the bill of lading to the agent of the plaintiffs, no fraud had been committed. That act of transfer was very possibly intended as a fraud upon somebody ; although I suppose it not to be unusual in the commercial community to entrust the bill of lading to the intended vendee for the very purpose of enabling him, by a pledge of the same as security, to raise the money with which to accomplish the payment for the goods. I am unable to see that the purchase was *originally* fraudulent, or that the transaction is obnoxious to any other imputation of fraud, than such as arises from a *subsequently conceived* determination not to pay for the goods. It may be said that Mack was not in fact the vendee, but only a proposed purchaser having the refusal of the goods. But I do not think this is sufficient to prevent the operation of the rule. In *Keyser* v. *Harbeck*, (3 *Duer*, 391,) it is said : "So if the true owner has entrusted to a third person written evidence of title, or of an absolute and unqualified power of disposition, any one who advances his money to, and obtains possession of the property from, such third person in good faith, relying on the facts being in conformity with this written evidence of their truth, will acquire

Dows *v.* Rush.

an indefeasible title as against the true owner." (*See also,* 20 *Wend.* 272.) Under such circumstances I do not think there was any substantial error in the charge of the judge that Niles & Wheeler and the defendant were, as against the plaintiff, estopped from denying that they held the corn as Mack's agents and carriers, if by that he intended, as I think he did, that they were not in a situation effectually to dispute the plaintiff's title thus acquired. The result of the whole transaction, taken together, was, as it seems to me, that the plaintiffs were entitled to recover, and so the judge charged. And if he was right on this point, his charge on the question of estoppel may be rejected as immaterial or inapplicable to the facts, and therefore no ground for reversal, as it could work no possible prejudice. (*Lyon* v. *Marshall,* 11 *Barb.* 241. *Onondaga Co. Ins. Co.* v. *Minard,* 2 *Comst.* 98. *Shorter* v. *The People, Id.* 193.) Nor does it seem to me to be necessary to discuss the full extent of negotiability that appertains to bills of lading, inasmuch as they are conceded to be so far negotiable, as that in a proper case their indorsement carries with it the title to the document transferred, and the title to the property thereby represented. This is enough for the purposes of the present case ; and being so, it is not essential to consider whether the doctrine as to negotiability of bills of lading put forth by the learned justice who delivered the opinion of the court in *Dows* v. *Perrin,* (16 *N. Y. Rep.* 332 *to* 335,) is not too much restricted. It does not seem to have been the point in judgment, and therefore conclusiveness as authority will not probably be claimed for it. And lest it should be supposed to command unqualified assent, I would suggest that the doctrine there advanced deserves very grave consideration in the present advanced state of commercial law, and the multiplicity of transactions involving the proper construction of these instruments, before it should be regarded as firmly and incontrovertibly established.

As it is possible we may not have arrived at the correct conclusion upon this point, it is proper to look at this case in an-

other aspect; that is, as affected by the factor's act. (*Laws of* 1830, *ch.*179, §§ 1, 2. 2 *R. S. 4th ed.* 184.) This act provides, in substance, that every person in whose name merchandise shall be shipped, shall be deemed the true owner thereof, so far as to entitle the consignee to a lien thereon for any money advanced or negotiable security given by such consignee to such first named person. As the corn was shipped on account of Mack, he must, I think, be considered as included within the class of persons first described, and the plaintiffs are, I think, the consignees thereof; although from the loose manner in which bills of lading are frequently addressed in the margin of the bill, I can conceive that much confusion will sometimes arise in determining who is the consignee, within the meaning of this act. By the second section the lien is restricted to consignees who act in good faith; and such, as already stated, we must regard the plaintiffs, in this case. They therefore had a *lien.* My principal difficulty upon this part of the case has been whether the statute intended to limit them to the right of detention of the goods when in their actual possession for the enforcement of their lien, or also to authorize an action to obtain possession against a party who claimed them without right or under an inferior title. Strictly speaking, a lien only gives a right of detention and not of acquisition. But if we carry out the established doctrine in regard to these documents, that the possession of the symbol is the possession of the thing itself, like the key of a warehouse, (*Bank of Rochester* v. *Jones,* 4 *Comst.* 507,) then we may properly regard the plaintiffs as being in the constructive possession, and as legitimately resorting to this action to perfect and secure their right by reducing the property into actual possession. On the whole this seems to be the better view of this question; and if so then the plaintiffs had a perfect cause of action under this statute; and independent of any other question, the judge properly charged that the plaintiffs were entitled to recover.

The only remaining question respects the rule of damages.

Butterworth v. O'Brien.

The judge upon request refused to charge that the plaintiffs' damages were restricted to their advances and interest thereon. Strictly speaking, damages in an action of replevin are the loss which the plaintiff has sustained by the detention of the property; except where he is unable to obtain its return. It was evidently *assumed* at the trial that the question presented by this request was the amount for which the plaintiffs were entitled to judgment, and, so considered, the court was right in refusing the request. In an action of replevin, by a party having a lien, the plaintiff, as in other actions of replevin, is entitled to a return of the property, and if a return cannot be had, to its value. (*Wheeler* v. *McFarland,* 10 *Wend.* 318. *Baker* v. *Hoag,* 3 *Barb.* 203. *S. C.* 7 *Id.* 113. *S. C.* 3 *Seld.* 557.) The object is to procure a restoration of the possession, and when that is done the lien holder retains the property as a trustee for the general owner, and on being tendered the amount of his lien, is bound to restore the property to him or submit to a proper action for redress.

On the whole case I think that justice has been done, and no legal error to the actual prejudice of the defendant committed; and therefore that the judgment of the circuit court should be affirmed.

[NEW YORK GENERAL TERM, September 20, 1858. *Davies, Sutherland* and *Hogeboom,* Justices.]