Denio, Ch. J.
 

 The decision of this case depends upon the determination we shall come to as to the title of the corn-in question, at the time the papers by which the action was commenced were served. The defendants derived their right from Messrs. Niles
 
 &
 
 Wheeler, and these persons being originally the owners, the defendants were entitled to prevail, unless the plaintiffs had, at an earlier period, acquired, the title which Niles & Wheeler formerly had. I am of opinion that the paper which was executed by E. H. Walker in the name of Niles & Wheeler is in the nature- of, and that, so far as this case is concerned, it is to be considered us. a bill of lading. Niles
 
 &
 
 Wheeler were the ow?
 
 *321
 
 the corn, and moreover they were the joint proprietors, with Caleb, of the canal boats in which it was shipped; and besides, they were the agents of those proprietors as a firm, and entitled to make contracts in their behalf for the transportation of property. To be fonnal, the paper should have been signed by the masters of the several boats. But the principal effect of their signatures, regarding them as the servants of the proprietors of the line, as they were, would have been to bind those proprietors to the contract for the transportation of the corn. Again, the regular method of setting forth the title of Mack, as the consignee or party entitled to control the com on its arrival, would have been for the owners who had thus shipped it to have indorsed the bill, making the corn deliverable to him or his order. This, however, was done in substance, by stating ujjon the face of the paper that the shipment was made on his account. /When the document thus prepared was delivered to Mack, it purported to be a transfer from Niles & Wheeler to him of the corn, and to be a contract, on the part of the proprietors of the transportation line, to carry it to New-York and deliver it there to Dows & Carey as his agents, or otherwise according to his directions, for the price of freight mentioned in it./ To be available to the plaintiffs as the source of title in themselves, it must have contained all the features which I have mentioned, and if the case was a fair one in other respects, I should find no difficulty in attributing that effect to the document; but it was not executed by Niles & Wheeler, or either of them personally, nor under their immediate directions nor by their express authority; but it was prepared and signed in then- name by Mr. Walker as their clerk and agent. There was no contract between Niles & Wheeler and Mack for the sale or for the transportation of the corn, unless it was made by Walker,
 
 j
 
 On the trial it was submitted to the jury to determine whether he had authority to execute the contract contained in the bill of lading on their behalf, and the jury have found that he had such authority. / If there
 
 *322
 
 was any evidence competent to be submitted to them upon that question, the verdict is conclusive upon this part of the case; and this is the first point to be considered.
 

 In inquiring whether Walker had authority to do the act which he assumed to do, we must recur again to its nature and effect. It was, in the first place, a transfer to Mack of a large amount of produce belonging to Niles & Wheeler; and, in the second place, an agreement by the forwarding firm, in which they were partners and for which they were agents, to transport it to New-York for him. To enable Walker to consummate such a transaction, he must have been authorized by Niles & Wheeler, as individual proprietors of this property, to make an executed contract for its sale. He did not need a power which should look to this property in particular, but it was necessary that he should have been clothed with an authority which would embrace such a transaction; and finally, he must have been authorized by the proprietors of the line to make contracts for freight to New-York. But it would not be enough if he possessed the latter power, if he had not also the other.', The most important part of the transaction was that which assumed to divest Niles & Wheeler of theii title to the com and to confer that title upon Mack.
 
 \
 
 If he had no authority to do this, he was not authorized to execute the power under which the plaintiffs claim. If he had not that authority, the plaintiffs cannot make title to the corn through that document.
 

 The bill of lading shows upon its face that it was executed by Walker on behalf of Niles & Wheeler. When Chappel, the plaintiffs’ agent, received it and made the advance, he" was bound to inquire as to the extent of Walker’s powers^ and was chargeable with knowledge of these powers, such as they turn out in fact to be. In this case, there having been no formal delegation of power, the authority of the clerk was limited to acts of such a description as he was accustomed to perform, with the knowledge and acquiescence af his employers. The evidence failed to show that in any
 
 *323
 
 instance he had acted in such a transaction as this. His employers were engaged in two several branches of business, quite distinct in their nature. As agents for the transportation line, they were transacting a forwarding business in which & they and Caleb were interested as partners, and they were at the same time engaged in the purchase and sale of produce on their own account, and perhaps on commission. They were also storehouse keepers. Walker was their clerk, and as such was employed in making out and signing papers relating to the shipment of property of others, which came into and passed through their hands as forwarders, and which were deposited with them in store. This was a simple clerkship, and requiring the exercise of no special judgment or discretion. The evidence is that his employment was limited to such transactions. He is not shown to have taken any part in the purchase or sale of produce on a single occasion, or to have ever authenticated any paper relating to that business. It seems to me entirely clear, upon the evidence, that if he assumed-to sell the corn in question, or to sign an instrument which purported to transfer it to another, the act was altogether beyond the scope of his agency. The \ judge should therefore have decided, as matter of law, that J Niles & Wheeler were not bound by the bill of lading, and
 
 as
 
 the plaintiffs deduced their title solely under that instrument, they should have been nonsuited.
 

 As this action may be again tried, and further evidence may be given upon the question of agency, it is proper that the court should determine another question arising upon the case.( Assuming that Walker had power to sign the bill of l lading on behalf of Niles & Wheeler, and giving to that paper-as a commercial instrument the effect which I have attributed to it, was it negotiable in such a sense as to confer upon a
 
 bona fide
 
 transferee a title not affected by the fraud committed in obtaining it ? Mack clearly could claim nothing under it.
 
 /
 
 Taking the offer of proof in connection with what was in fact proved, it was obtained by Bloss representing to the clerk, in
 
 *324
 
 the absence of his employers, that tiróse employers had sold to him, Bloss, the corn in question, when in fact no such transaction had taken place. On the strength of that representation the clerk made out and signed the bill of lading in question on behalf of Niles & Wheeler, operating, as I have shown, to transfer the corn to Mack, the nominee of Bloss. Bloss acted in that business on behalf of Mack, in whose favor the instrument ran, under some arrangement which is not disclosed. Mack does not stand in the position of an innocent holder. He is a party to the very instrument affected by the fraud, and can claim nothing under it against Niles & Wheeler, or the defendants who hold the title which thej had. But Mack transferred the paper to the plaintiffs, who, I assume, advanced money upon it in good faith and without notice.
 
 (
 
 if the paper was negotiable, with the same effect as ; a bill of exchange, or promissory note payable to bearer, the plaintiffs have a title unaffected by the fraud of Mack; otherwise they have not/ I think that the courts have gone no further upon this subject than to hold that the
 
 lona fidt
 
 indorsee of a bill of lading, for value, is not liable to have the property which it represents stopped
 
 in transitu
 
 by his con signor on account of the non-payment of the purchase price The right of stoppage
 
 in transitu
 
 obtains when the sale was in all respects valid, where there was no condition attached to the delivery to the carrier, and where the title and the right of possession are transferred to the purchaser upon the execution of the instrument of sale. The right to arrest goods so sold while in the hands of the carrier, when the sale was on credit and the purchaser has failed, is one conferred by law independently of any contract between the parties, and it assumes the entire validity of the contract of sale. The right is peculiar in its character, and bears no analogy I to the power to treat as void a transaction invalid on account of fraud. The right of stoppage
 
 in transitu
 
 is cut off by the transfer of the bill of lading to a
 
 Iona fide
 
 purchaser, • but it by no means follows that the holder of such
 
 *325
 
 a, bill, void on account of fraud, can confer a better title than he had himself, and I am of opinion that he cannot dc so. The quality of transferability which pertains to a bill of lading was largely discussed in the noted case of
 
 Lickbarrow
 
 v.
 
 Mason,
 
 on the several occasions when that case came before the English courts. None of the judges affirmed that it was negotiable in the same sense as a bill of exchange, but that position must be established in its fullest extent in order to hold that these plaintiffs obtained a good title by their transaction with Mack.
 
 Lickbarrow
 
 v.
 
 Mason
 
 should, I think, be considered as establishing the precise point which arose in the case, and nothing more. To that extent it has ever since been followed, and is no doubt settled law. (2
 
 Durn. & E.,
 
 63; 1
 
 H. Bl.,
 
 367; 2
 
 id.,
 
 211; 5
 
 Durn. & E.,
 
 367, 683.) The subsequent cases down to a certain period have been collected and examined by the American editor of
 
 Smith’s Leading Cases.
 
 His conclusion I understand to be, that a bill of lading is not negotiable in a commercial sense, and that, in the absence of a right of property in the consignee, and of a power to sell, he cannot by any indorsement of the bill of lading confer a title to the goods as against the true owner.
 
 (Vol. 1, p.
 
 543,
 
 Phil. ed. of
 
 1844.) Mack certainly had no right of property in the corn. His pretended purchase, effected through Bloss, was utterly void on account of fraud. Niles & Wheeler could have taken it from him if he had obtained the actual possession, and could have maintained trespass, or replevin in the
 
 cepit,
 
 for any act of ownership which he might have exercised in respect to it. (
 
 Carey
 
 v.
 
 Hotailing,
 
 and
 
 Olmsted
 
 v.
 
 Same,
 
 1
 
 Hill,
 
 311, 317.) If the bill of lading had been made out by Niles & Wheeler, and had been stolen from their desk, where it had been awaiting the payment of Bloss, he would have obtained as gpod a title to it as he did by procuring it by the use of the means which he adopted, and this of course would have been no title which he, or any one claiming under him, could have asserted.
 
 (Brower v. Peabody, 3 Kern.,
 
 126.) A
 
 *326
 
 question similar in principle lately came before the Queen’s Bench, in
 
 Gurney
 
 v.
 
 Behrend
 
 (3
 
 Ellis & Bl.,
 
 622). In that case the plaintiffs were the
 
 bona fide
 
 holders of a bill of lading which had come into the hands of one Pries, from whom the plaintiffs immediately obtained it as security for an advance of money. The defendant claimed under the original owner and shipper of the goods, who contended that the parties who delivered the bill to Pries had appropriated it in fraud of their, the shippers’, rights. Bills of exchange had been drawn on London for the purchase price of the goods, and the shipper contended that the bill of lading was not to have been delivered until the bills of exchange were accepted. They were refused acceptance, and the drawers became bankrupt, but the bill of lading was delivered over and was then put in circulation, and came to the plaintiffs
 
 bona fide.
 
 Lord Campbell, delivering the judgment of the court, said:
 

 A bill of lading is not, like a bill of exchange or promissory note, a negotiable instrument "which passes by mere delivery to a
 
 bona fide
 
 transferree for a valuable consideration, ¡without regard to the title of the parties who make the transfer. Although the shipper may have indorsed in blank bill of lading deliverable to his assigns, his right is not1 ¡affected by an appropriation of it without his authority. If be stolen from him or transferred without his authority, a subsequent
 
 bona fide
 
 transfeiTee cannot make title under it against the shipper of the goods. A bill of lading only represents the goods, and in this instance the transfer of the symbol does not operate more than a transfer of what is represented.” He added, that if the delivery to Pries was a misappropriation of the bill of lading, the shippers would have a right to stop the goods
 
 in transitu.
 
 The case was decided upon another ground, namely, that no condition had been annexed to the delivery of the bill of lading to Pries It is true, it cannot be claimed that what was said by the venerable chief justice is strictly authority; but as the opinion was delivered after an adjournment, and seems to have
 
 *327
 
 been prepared with care, and no dissent from other members of the court was expressed, it is entitled to great weight, and will, no doubt, be followed in the English courts. That it was intended to be a precedent for future cases is further evident from what was added by the chief justice in conclusion : “ No decision or doctrine,” he said, “was cited in the argument which at all conflicts with the view we have taken of this case, and we conceive that it is in entire conformity with various decisions relied upon by the plaintiffs.”
 
 Lick-barrow
 
 v.
 
 Mason
 
 had been pressed upon the attention of the court by the plaintiffs’ counsel, and the chief justice further added, that he approved of the decision in that case, and of the doctrine that when a bill of lading is put into circulation by the authority of the owner of the goods (the shipper or consignee), a
 
 bona fide
 
 transferree of an absolute title is freed from the equitable right of the unpaid vendor to stoppage
 
 in transitu.
 
 The same view of the effect of a bill of lading was taken by members of this court in recent cases,where however the precise point was not in judgment. (3
 
 Kern.,
 
 628, per Comstock, J.;
 
 Farmers and Mechanics' Bank
 
 v.
 
 Butchers and Drovers' Bank, ante,
 
 p. 140,
 
 by
 
 Selden, J.) (Without dwelling upon the point, I am clearly of the opinion that when a bill of lading is obtained by fraud from the owner of the goods, a
 
 bona fide
 
 indorsee or transferree has no better title than the indorser had. / I think, therefore, that the1 Superior Court fell into an error upon this part of the case.
 

 The judgment should be reversed and a new trial ordered, with costs to abide the event.
 

 Comstock, J., did not sit in the case; all the other judges concurring,
 

 Judgment reversed anc new trial ordered.