### Dows, survivor, &c. *vs.* Greene and Mather.

A bill of lading need not be signed by the master of the vessel. It is sufficient if it be signed by the consignor of the goods, who is also owner of the vessel.

What will amount to proof of an implied authority in a clerk in a mercantile house to sign shipping bills in the names of his principals.

Where consignees make advances upon a bill of lading, to the holder, in good faith, relying upon the same as evidence of the holder's ownership, and without notice of any facts justifying the conclusion that he was not the real owner, or that any fraud was meditated, or had been committed in the purchase of the property, they will be deemed *bona fide* purchasers, and entitled to hold the property, to the extent of their advances, as against the consignors or subsequent purchasers from the latter.

Under such circumstances, the consignors will, as in other cases of a bona fide change of ownership, lose their right of stoppage *in transitu*, notwithstanding the purchase of the property from them may have been fraudulent.

And the right of the consignees being protected by the 1st and 2d sections of the factor's act, (3 *R. S.* 76, 5*th ed.*) they may, after demand and refusal to deliver the property to them, maintain replevin against the person in possession, to recover the property, or its value.

THIS was an action to recover a quantity of corn. On the former trial of this cause the defendants had a verdict. A new trial was granted by the supreme court in the third district, (*see* 16 *Barb.* 72.) The cause was tried the second time before Hon. Wm. B. Wright, without a jury, and resulted in a judgment in favor of the plaintiffs. The plaintiffs, Dows & Cary, were commission merchants, doing business at New York, and claimed title to the corn as bona fide purchasers or lien holders thereof for value from Mack, as an alleged purchaser thereof from Niles & Wheeler, and also as consignees of the corn shipped by Mack on the boat of Niles & Wheeler, and holders or indorsers of the bill of lading therefor. The defendants claimed title to the corn as bona fide purchasers thereof from parties who had obtained title from Niles & Wheeler, after the latter had repudiated the sale to Mack as unauthorized by them, and also as fraudulent. Niles & Wheeler were forwarders, at Buffalo, and agents of the American Transportation Line of Canal Boats, which line was owned by them and M. M. Caleb, of New York, who

was their partner in the forwarding business. Niles & Whee-ler also purchased and sent corn to market, on their own account. The plaintiffs claimed the corn under certain bills of lading executed at Buffalo, dated August 7th, 1848, by Niles & Wheeler per E. H. Walker, their clerk and agent, showing the shipment of the corn to account J. F. Mack, care of plaintiff, New York. The form of the several instru-ments herein called bills of lading, is given in the case, and one of them, that on which the plaintiff relies to recover, is as follows: "No. 143, duplicate. Buffalo, August 7, 1848. Shipped in good order by Niles & Wheeler, agents, on board canal boat Neptune, —— master, American Transportation Company's Line, the following named articles, made and con-signed as in the margin, to be delivered as addressed without delay. Account J. F. Mack, care of Dows & Cary, N. Y. 2385 bushels corn, Ohio freight to New York, per bushel 13 cts. Niles & Wheeler per E. H. Walker." By a subsequent bill of lading the quantity was corrected, and stated at 2565 bushels of corn.

Mack resided at Rochester, and was a dealer in grain. James L. Bloss resided at Rochester, and had for several years been purchasing grain in his own name, but in fact as the agent for other persons and by their direction. He had for five or six months previous to the transaction in question, been making such purchases as the agent of Mack, and had received the money promptly in each instance. In transac-tions of this kind, he had asked for duplicate bills of lading, and the vendors had given the bills before the delivery of the property and before receiving payment. They had trusted to his honor and the integrity of the man at Rochester to send the money, and it had always come. Niles & Wheeler had purchased a cargo of about 10,000 bushels of corn, which was on board the propeller Montezuma, lying near their ware-house at Buffalo. On Monday the 7th of August, 1848, Bloss called at the office of Niles & Wheeler and proposed to purchase the corn, intending it for Mack, but did not

mention the fact that he was acting as an agent. The negotiation was between Bloss and Niles, the price asked was forty-four cents per bushel, and Bloss said he would take the corn if he could have a little time to get money from Rochester, and gave a reference for certainty of payment. Niles said he wanted no reference, as they would only sell the corn for cash. Bloss thereupon left the office but was immediately called back by the order of Niles. When the negotiation proceeded, Niles asked where Bloss wished to transport the corn, and on being answered, to New York, he said they could perhaps make arrangements if he (Niles) could transport the corn. It was finally agreed that the money should be paid half on Friday and the remaining half on Saturday, and that Niles & Wheeler should transport the corn to New York on their boats, at thirteen cents per bushel. Niles said he would not sell on credit to any body; that he would hold the corn on his boats until it was paid for, and such was the arrangement between them. Bloss said Niles would be indemnified by the property itself, as he (Bloss) would not get possession of it until it was paid for. Bloss immediately telegraphed to Mack advising him of the purchase of the corn, mentioning quantity and price, and on the evening of the same day Bloss received the bill of lading before referred to, executed in the name of Niles & Wheeler, by Walker their clerk. He had before made out some bills of lading, and evidence was given tending to show his authority, and also that Niles was present when he made out the bills of lading. The defendant gave evidence tending to show that Walker had never signed such bills of lading before, but only bills where the goods shipped belonged to other persons and not to Niles & Wheeler. Walker made a distinction between receipts for property and memoranda of shipment, (such as he claimed these to be,) and regular bills of lading. The corn was shipped on the boats Cuba, Neptune, P. B. Langford and A. Beardsley. The loading was commenced, according to Bloss, on the same day, (Monday, 7th August,) and as

Dows *v.* Greene.

Bloss thinks, was completed as to two boats, (Cuba and Neptune,) the same day. Van Inwegan, the tally clerk, says the loading of the Neptune was commenced on Monday, and completed on Tuesday or Wednesday, and the Cuba started first on the 9th, (Wednesday,) and the Neptune on the 10th, (Thursday.) The evidence left the time of lading in some doubt. On Monday, the day of the purchase, Bloss got the tally of the cargo of the two boats, (Cuba and Neptune,) and delivered them at the office of Niles & Wheeler about six or seven o'clock in the evening, and received from Walker, their clerk, bills of lading of the two boats. Bloss sent the bills of lading to Mack the same day, informing him that the corn was to be paid for on Friday or Saturday. The plaintiffs had been at Rochester on the 5th or 6th of August, and had agreed with Mack to make advances to him on corn, to thirty-eight cents per bushel, on his furnishing shipping bills for the corn. The business was to be done on the part of the plaintiffs by James Chappel, their general agent at Rochester. Mack was to furnish the shipping bills to Chappel, who was to indorse Mack's drafts on the plaintiffs, for the amount of the advances, which the plaintiffs were to accept and pay. Advances to Mack in the same way had been made before. On Tuesday, the 8th of August, Mack presented to Chappel the two bills of lading, (Cuba and Neptune,) and drew two bills on the plaintiffs, one for $1000 at thirty days, and one for $800 at twenty-five days, both payable to the order of Chappel, and both indorsed by him, on receiving the bills of lading, and the drafts were delivered to Mack. Mack passed and negotiated the drafts to the Rochester City Bank, and received the money therefor. On the same day Chappel enclosed the shipping bills to the plaintiffs in New York. The two drafts were presented for acceptance by the American Exchange Bank, and accepted by the plaintiffs on the 10th of August, (Thursday,) and were paid at maturity. On Friday the 11th of August, Bloss sought Niles and told him that he had sent shipping bills of the corn to Roch-

ester to Mack, for whom he had bought the corn, that he had not received the money and did not know what the matter was, that he had never been disappointed in receiving money, but had previously received it promptly in every instance. Niles said this was the first he had heard of Mack or of shipping bills, and he should sell the corn. Bloss asked him to wait till he could telegraph Mack and get an answer, and Bloss did telegraph him several times without getting any answer. He then proposed that Niles or his clerk should go with him to Rochester, saying he would pay the expenses and get the money or give up the corn. Niles said Van Inwegan (his clerk) might go, and he went that day with Bloss to Rochester, where Bloss found that Mack had failed and left town on Thursday. On that day, the 10th of August, Mack made a general assignment of all his property to John Brown, preferring him to the amount of about $10,000, and distributing the residue of his property equally among the rest of his creditors, among whom Niles & Wheeler were named as creditors for corn sold, to the amount of about $4,400. On Saturday Van Inwegan telegraphed Niles that the corn was not paid for, and Mack had run away. Niles then sold the corn to P. Durfee & Co., at Buffalo. Durfee & Co. consigned the corn and delivered the bills of lading to Arthur H. Root. Root transferred them to Joseph H. Green, jun. the latter to Green & Mather, and they to L. W. Brainard, and under these parties the defendants claimed to hold the property, and on demand made refused to deliver it to the plaintiffs. On Saturday afternoon Niles went to Rochester; went up the canal on Sunday, and met three of the four boats and gave them new bills of lading on account of P. Durfee & Co., care of Arthur H. Root, Albany. The Cuba had passed Rochester before he got there. He sent a bill after her, to be signed, which seems to have been done. The boats had all left Buffalo with bills of lading to M. M. Caleb & Co., New York. On Friday, the 11th of August, when

Dows *v.* Greene.

Niles was informed of the bills of lading to the plaintiffs he telegraphed them as follows:

"Ten thousand and ninety bushels of corn shipped by us on boats Cuba, Neptune, A. Beardsley, P. B. Langford, acc't J. F. Mack, to Dows & Cary, is not paid for. We notify you to consider and hold the same to our account till further notice.                   NILES & WHEELER."

There was a mistake in the amount of the corn as stated in the first bills, and this was corrected on Wednesday. When the Neptune arrived at Albany the plaintiffs demanded the corn of the defendants, and offered to pay the freight, the defendants then having possession thereof; but they refused to deliver it, and denied the plaintiffs' right to the corn.

The same testimony given on the former trial was read by consent, on the second trial. The plaintiffs proved by Bloss, in addition, that the bills of lading were made out by Walker, he having been referred to by some apparently responsible man in the office as the proper man for that purpose, and that, as he thinks, Niles was present in the office when he made out the bills of lading, and that subsequently when the fact was again talked over, Niles made no objection on the ground of want of authority. The bills of lading were in the hands of Bloss, at Buffalo, on the 9th of August. Cary, one of the plaintiffs, saw them there, and having looked at them handed them back to Bloss, who then mailed them to Mack at Rochester, who delivered them to Chappel's clerk, receiving from him therefor two drafts of Mack on the plaintiffs, payable to the order of and indorsed by Chappel, one for $1000, and one for $800, which Mack procured to be discounted at the Rochester Bank. The bills of lading were immediately sent by Chappel's clerk to New York, where they were accepted by the plaintiffs on the 10th of August, and subsequently paid by them at maturity some 25 or 30 days thereafter.

The parties then rested, and the defendants' counsel renewed the motion for a nonsuit which had been before made

at the close of the plaintiff's testimony, upon the following grounds: *First.* That the plaintiffs should show that Walker was authorized to make and execute the contract for the sale of this corn. *Second.* That Chappel was bound to inquire as to the extent of Walker's powers, and is chargeable with knowledge that he had not any proof of any agency to execute a bill of lading, and no proof of any power to make a contract. *Third.* There was no proof of authority to Walker to sign and execute bills of lading for Niles & Wheeler. The judge on each occasion overruled and denied the motion for a nonsuit, to which decision and ruling the defendants on each occasion excepted. And thereupon the said justice made his statement of facts found by him, and his conclusions of law, in the premises, as follows, to wit:

"*First.* I find that Niles & Wheeler, from whom both parties claim title to the 2565 bushels of corn in question in this action, were partners, dealing in produce, at Buffalo, N. Y., during the year 1848, and that they were also engaged in the business of transportation upon the Erie Canal, with one M. M. Caleb, at the same time, under the style of 'American Transportation Company,' Niles & Wheeler at Buffalo, and said Caleb having his office for the company in the city of New York; between which cities the said transportation business was carried on; and that on and before Monday, the 7th day of August, 1848, the said Niles & Wheeler, as produce merchants, were the owners of the said corn. *Second.* I find that on the 7th day of August, 1848, the said corn was in the lake boat called the Montezuma, of said Niles & Wheeler, at Buffalo, and that on said day one James O. Bloss came into their office and commenced a negotiation with said Niles, for the purchase of the said corn, which resulted in a verbal agreement for the purchase of said corn, at 44 cents per bushel, for cash, to be paid half on Friday and half on Saturday, the 11th and 12th days of August, 1848; that said Niles & Wheeler were to ship the corn, for Bloss, on the boat of the American Transportation Company, (of which

company they were members, and acted at agents,) for New York, and to transport the same there for the sum of 13 cents per bushel, to be paid by said Bloss; that said contract was *made by said Bloss, as the agent* of and for one J. F. Mack, and he acted throughout as such agent, *though he did not disclose the fact* to Niles & Wheeler that he was acting as agent for Mack until after the agreement had been made, and subsequently to obtaining the bill of lading, as hereinafter stated. Under this agreement, the corn in question in this case was shipped and transferred from the lake boat Montezuma to the canal boat Neptune, on the 7th August, 1848. That on the 7th day of August, Bloss obtained from one Walker, a clerk in the office of Niles & Wheeler, a bill of lading for said corn, which bill stated that the said corn had been shipped in good order by Niles & Wheeler, agents, on board the canal boat Neptune, marked and consigned as in the margin, to be delivered as addressed without delay. In the margin was as follows:

"Account" J. F. Mack,     Freight to New York, a bushel, 13 cents.
Care of     (Signed,)
Dows & Cary, N. Y.     Niles & Wheeler,
           *per* E. H. Walker.

That Bloss obtained said bill of lading in good faith, and Walker had authority to execute it for Niles & Wheeler, and it was in fact so executed by Walker, with the knowledge and sanction of one of the firm of Niles & Wheeler; that said shipping bill was by said Bloss transmitted to J. F. Mack at Rochester, and said Mack obtained from the plaintiffs, through their agent, an advance thereon, upon the faith thereof, on the 8th August, 1848, of 38 cents per bushel; said advance was made by indorsing the drafts of Mack, drawn at Rochester on the plaintiffs at New York, and dated 8th August, 1848, and accepted by the plaintiffs on the 10th August, 1848, and paid by them at maturity; said drafts were indorsed by the agent of the plaintiffs at Rochester, on

the 8th August. And the same were negotiated and discounted, and the money obtained thereon on the same day by Mack, at Rochester. Such advance was made by the plaintiffs in good faith upon said bill of lading, without any notice or knowledge of any kind to them or their agent, or any fraud having been committed or intended by any one in the purchase of the said corn or in obtaining the said bill of lading. I further find that said Bloss gave notice to Niles & Wheeler on Friday the 10th day of August, 1848, that he had not received the money from Rochester to pay for said corn as he had expected, and for that reason could not complete the purchase of it; and then first informed them that he was acting as the agent of Mack in the purchase of the corn, and not on his own account. Bloss proposed to Niles & Wheeler, that if they would send a man with him to Rochester, if he did not get the money he would give up the corn. Van Inwegen, who was in the employ of Niles & Wheeler, went to Rochester; upon reaching Rochester, Bloss found that Mack had failed and absconded. Mack, the day previously, on the 10th August, 1848, had made a general assignment of his property, a copy of which was given in evidence, and is set forth in the preceding case. I further find that on the 12th August, 1848, Niles & Wheeler assumed to sell the corn to P. Durfee & Co., at Buffalo, and delivered to them other bills of lading thereof; that said canal boat Neptune was on her way to New York, under the bill of lading to Mack with said corn, and had got as far as Rochester, when she was overtaken by Niles on the 13th August, and her papers changed as to the bill of lading; that on the 14th August, 1848, a duplicate bill of lading of the corn on the Neptune was delivered, signed by Niles & Wheeler to Durfee & Co. Niles & Wheeler also executed a bill of sale of the corn to them. Durfee & Co. paid Niles & Wheeler for the corn by drafts on A. H. Root, which were accepted by Root, and subsequently paid. That Durfee & Co. caused the corn to be delivered to the defendants herein.

Dows *v.* Greene.

I further find that said canal boat Neptune had 2565 bushels of corn on board of her on the 8th August, 1848, and when she left Buffalo, and the said bill of lading issued on the 7th August to Bloss was corrected in the amount of corn on board, by another issued in the same form and manner and by Walker, under the same authority, on the 8th August, 1848, stating the amount of 2565 bushels as the quantity on board the Neptune, which corrected bill was sent to Rochester, and was there on the 10th August, on which day a further advance was made thereon in like manner as that made on the 8th August, so as to make up the amount of 38 cents a bushel on the whole cargo of 2565 bushels.   That afterwards, and after the boat Neptune had arrived at Albany, on her way to New York with said corn, and on or about the 22d August, 1848, the defendants took possession of her and claimed to hold said corn on behalf of said Durfee & Co. and denied the right or title of said plaintiffs to said corn, or any part thereof.   The plaintiffs then demanded the corn and the delivery thereof, offering to pay to the defendants the freight of 13 cents per bushel thereon.   The defendants refused to deliver the said corn to the plaintiffs, and denied their right to the same, or their having any interest therein.   The corn was worth at the time it was replevied, viz: the 22d August, 1848, fifty-five cents per bushel, making the whole value $1410.75.   The interest on that sum to 27th September, 1858, is $997.67."

And he decided as matter of law upon the preceding statement of facts, 1st. That the plaintiffs were consignees of said corn under and by virtue of the facts stated, and obtained a lien upon said corn under the factor's act for the sum advanced upon the faith of the said bill of lading, viz: thirty-eight cents per bushel, upon the amount of said load of corn on the canal boat Neptune.   To which ruling and decision the defendants' counsel excepted.   2d. That the plaintiffs, as bona fide purchasers for value to the extent of their advances, were entitled at common law, as well as under the

statute, to the possession of the corn, before and at the commencement of this suit. To which ruling and decision, either that the plaintiffs under the facts proved were bona fide purchasers of the corn to the extent of their advances, or that they were entitled at common law or under the statute to the possession of the corn at the commencement of the suit, or at any time before, the defendants' counsel excepted. 3d. That the plaintiff as survivor of Ira B. Cary was entitled to judgment for the recovery of the possession of the corn, and his damages for the retention thereof; or in case delivery could not be had, that he recover for the value thereof the sum of $1410.75, besides the said damages of $997.61 for detention. To which ruling and decision that the plaintiff was entitled to recover the possession of the corn, or damages for its detention, or that he was entitled to recover at all in the action, the defendants' counsel excepted. And the defendants excepted severally, 1. To each of the findings of fact in the preceding statement of facts, as against evidence. 2. And they also excepted severally to each finding as a conclusion of law in the preceding statement. 3. And they separately excepted that the said justice should have found upon the evidence that the said plaintiffs were not bona fide holders of said bill of lading obtained by Bloss on the 7th August, 1848, but that the same contained on its face sufficient to put Chappel and the plaintiffs upon inquiry as to its validity. 4. And they excepted separately, that the concealment of agency by Bloss for Mack from Niles & Wheeler, was a fraud in law, which vitiated the bill of lading. 5. And they excepted separately, that the contract for refusal is fraudulent within the statute of frauds. 6. And they excepted separately, that as Cary was informed of the bargain of Bloss on or before the 9th August, 1848, his firm must be presumed to know the condition of the sale as to payment, and they accepted the drafts with notice of the condition, and were not bona fide holders of the bills obtained from Walker. 7. And they excepted separately, that the concealment of the

insolvency of Mack from Niles & Wheeler, was a fraud in law, which vitiated the whole contract for sale, and the bill of lading founded upon it. 8. And they excepted separately, that the assignment of Mack on the 10th August for his creditors, was conclusive evidence of his intent to defraud Niles & Wheeler in the purchase of the corn made on the 7th August. 9. And they also excepted separately to each ruling in the decision of matters of law in the aforesaid statement.

Upon this finding of the judge, judgment was entered for the plaintiffs, in accordance therewith, on the 29th day of November 1859, and the defendants appealed therefrom to the general term.

*L. Tremain,* for the plaintiffs.

*W. D. White,* for the defendants.

*By the Court,* HOGEBOOM, J. The action in this case is replevin, to recover 2565 bushels of corn alleged to have been unlawfully detained by the defendants from the plaintiffs. Both parties claim *title* to the corn, and through the same persons, Niles & Wheeler, who were at one time confessedly the owners thereof. The plaintiff's title, if otherwise valid, is prior in point of time to that of the defendants, and in such case must prevail. The question is upon the validity of the plaintiff's title; which is always the question in an action of replevin, and especially so in this case, as the defendants' title is in no way impeached, if the plaintiffs' title fails. The plaintiffs make title as alleged bona fide holders of the bill of lading, relying upon which as the evidence of title to the property, they made advances to the shipper of the goods, and they claim a lien to the extent of these advances as against the defendants, (who are subsequent purchasers of the corn from Niles & Wheeler,) both at common law and under the statute "relative to principals and factors and agents." (3 *R. S.* 76, §§ 1, 2.) The important inquiries,

therefore, to which we should direct our attention, are 1. Is the instrument, under which the plaintiffs claim, a bill of lading ? 2. Was it executed and delivered to them by the owners of the goods or their agent; or did the plaintiffs come into possession of it in some other way, in a manner to bind the owners, Niles & Wheeler ? 3. Did the plaintiffs make advances thereon in good faith before notice that the person in whose name the shipment of the goods was made was not the actual and bona fide owner thereof? Let us examine each of these propositions.

1. The instrument under which the plaintiffs claim was a bill of lading. If not exactly formal, it was substantially such. It did not detract from its force or validity that it purported to be the act of the *owners* of the *goods* and also of the *carrying vessel*, instead of their agent, the master or captain. Not only from its similarity to other bills of lading has this been argued to possess the character of such a paper, but this *very* instrument has in several instances been *adjudged* to be a bill of lading. That question, therefore, is no longer open to discussion. (*Dows* v. *Perrin*, 16 *N. Y. R.* 328, 9. *Dows* v. *Greene*, 16 *Barb.* 72. *Dows* v. *Rush*, 28 *id.* 183. *Bank of Rochester* v. *Jones*, 4 *Comst.* 497.)

2. The paper does not purport to have been executed by Niles & Wheeler personally, but by them " per E. H. Walker." We must therefore inquire into the authority of Walker to execute and deliver the instrument. He had no *express* authority. He was not instructed by his principals to execute the paper. But there is much evidence of *implied* authority. He was a clerk in the employ of Niles & Wheeler, the only indoor clerk at that time. He was a clerk in the shipping or carrying business ; a clerk to *make out* bills of lading ; a clerk to sign those of a particular character, to wit, where Niles & Wheeler were mere freighters and not owners of the goods. He does not recollect before to have signed any, where Niles & Wheeler were the owners ; but this nice distinction, it seems to me, cannot affect his real authority, or prejudice the

public or dealers with the concern, ignorant of any such limitation. It is somewhat remarkable that Niles, who was examined as a witness in the cause by the defendants, (Wheeler not being at home at the time of the transaction,) does not deny the authority of Walker to sign bills of lading, and is not examined upon that subject. On the first trial of the cause Bloss testified that he did not recollect that Niles was present when the bills of lading were obtained, or then knew of the fact; and Niles swore he did not. But on the second trial, now under review, Bloss testified that when he first inquired at the office for the bill of lading, some person within the bar or enclosure, and some person with whom he had conversed as to the purchase of the corn, referred him to Walker; and among the persons thus within the bar, was, he *thinks*, Mr Niles; that it was in pursuance of this reference that he got the bills of lading of Walker; and that when, after the bills were procured, he in a subsequent part of the week, spoke to Niles about having sent the bills of lading to Rochester, the latter did not, to his recollection, object to or deny Walker's authority to sign the bills. Upon this evidence the judge who tried this cause at the circuit without a jury, found " that Bloss obtained said bill of lading in good faith, and Walker had authority to execute it for Niles & Wheeler, and it was in fact executed by Walker with the knowledge and sanction of one of the firm of Niles & Wheeler." On this evidence I think we cannot, in a court of review, subvert this finding, or undertake to say it was a finding against the weight of evidence. There may be some little further evidence on this point, which has escaped my attention, but none, I think, of much moment, and I cannot therefore regard it as an appropriate case for granting a new trial on account of an erroneous finding on this question of fact.

Assuming the bill of lading to have been well executed by Walker in behalf of Niles & Wheeler, and to have gone into the possession of Bloss lawfully, did the plaintiffs make advances upon it to Mack in good faith, relying upon the bill of

lading as evidence of his ownership and without notice of any facts justifying the conclusion that he was not the real owner, or that any fraud was meditated, or had been committed, in the purchase of the corn ? This question has been answered in the affirmative by the judge who tried the cause, and I think upon sufficient evidence. There is some testimony tending to show that Bloss saw Cary on the 9th of August, at Buffalo, but none that he disclosed to him there the particulars of the contract; and some testimony tending to show that Dows went down the Hudson river with Mack after he made the assignment, but I can discover none seriously affecting or at any rate overthrowing the other facts in the case tending to show that the advances were made by the plaintiffs in ignorance of any circumstances tending to cast suspicion upon the title of Mack. A new trial upon that ground ought not therefore to be granted.

It remains to consider another question of some importance, made so by the decision of the court of appeals in the case of *Dows* v. *Perrin*, (16 *N. Y. Rep.* 325,) to wit, whether, assuming the bill of lading to have been executed under proper authority and to have been lawfully and intentionally delivered to Bloss, and to his principal Mack, and the plaintiffs as the indorsees of the bill of lading and the consignees of the goods to have made advances thereon to Mack in good faith without notice that he was not the owner of the goods, the plaintiffs' title to the corn is good, notwithstanding Mack may have intended a fraud in acquiring possession of the goods and purchased with a preconceived intention not to pay. For the purpose of considering this question, I assume that the intentions of Mack, though not of Bloss, were fraudulent, there being sufficient evidence in the case, perhaps, to justify such an inference, although the judge has not found the fact, and there is room for debate whether the fraudulent intent on the part of Mack was conceived until after Bloss had sent on to him the bills of lading from Buffalo. The court of appeals, in the case last cited, are reported to have decided that a bill

Dows *v.* Greene.

of lading is only so far negotiable as to protect a bona fide indorsee thereof for value from the exercise by the consignor of the right of stoppage *in transitu;* but when such bill of lading is obtained by fraud, from the owners of the goods, and there has been in fact no sale of them, an indorsee, though taking in good faith and for value, can obtain no better title to the goods than the indorsee had. The bill is of no effect, except when the assignor has at the time some right or authority operative as against the owner until rescinded by him. (*Dows* v. *Perrin,* 16 *N. Y. Rep.* 325.)

Now the first remark to be made in reference to that decision is, that the case called for no such adjudication. The court, before announcing the principle just quoted, had decided that the judge at the trial should have nonsuited the plaintiff for want of evidence of authority on the part of Walker to execute the bill of lading, and then proceeded to declare this principle in anticipation of the state of facts which might be presented upon a new trial. While the principle thus announced is, therefore, entitled to the greatest respect as the opinion of the highest judicial tribunal in the state, it does not possess the force of authority, as a rule of action in other cases.

Nor is it necessary to dispute the position maintained by the learned chief justice who delivered the opinion of the court, that Mack, as the fraudulent purchaser of the goods, was not in a situation to dispute the title of Niles & Wheeler or that of their bona fide assignees. He acquired no title by the purchase, on account of the fraud, and was liable to an action of replevin for the goods.

But the important question is, what right did the bona fide purchaser from him acquire; for such is the situation of the plaintiffs. I take it to be very well settled that a bona fide purchaser for value from a fraudulent vendee obtains a superior title to a subsequent bona fide purchaser from the vendor, where possession accompanies the sale from the fraudulent vendee. And in this case I think Mack must be deemed

to have had the possession. In the first place, Bloss, and through him, his principal, Mack, obtained lawful possession of the *corn.* The bill of lading was made out in the name of *Mack;* the goods mentioned in the bill of lading were deposited in the canal boat, and by virtue of the bill, and with the consent of Niles & Wheeler, the master of the boat held the goods as the goods of Mack; at least as the goods of Mack or of his consignees, the plaintiffs. He held them in no sense as the goods of Niles & Wheeler. In fact he held them as the property and for the benefit of the consignees, the plaintiffs. Prima facie the right of property, as between the consignor and consignee, is in the *latter;* though the transaction is subject to explanation, and the consignee may be shown to be the mere agent or depositary of the consignor. This being so, the goods on board of the canal boat were, with the knowledge and consent of Niles & Wheeler expressed on the face of the bill of lading, in fact held by the master of the boat for the plaintiffs as the owners thereof. Is it possible, under such circumstances and in the absence of fraud, that Niles & Wheeler could subsequently convey a valid title to the defendants?

Properly speaking, therefore, the question discussed in the case of *Dows* v. *Perrin* did not arise. The plaintiffs were not the *indorsees* of the bill of lading, but the *original* parties thereto, the very persons in whose favor the bill was made; and it seems unnecessary to discuss the question whether a subsequent indorsee receiving the transfer of the bill simply by indorsement or assignment from a fraudulent shipper or consignee of the goods, as a security for cash advances made in good faith, acquires a title untainted with the original fraud. In one sense, indeed, the plaintiffs may be said to be subsequent parties; that is, they are not the original purchasers from Niles & Wheeler, but purchasers from their fraudulent vendee. And although this assimilates them, somewhat, to mere indorsees in good faith of the bill of lading, yet I think the fact that the plaintiffs are the actual consignees of the corn—

Dows v. Greene.

named as such in the bill of lading—creates a material distinction in their favor.

But let it be conceded that the plaintiffs occupy the position simply of bona fide indorsees of the bill of lading, making advances in good faith upon the strength of Mack's supposed ownership of the goods, is it true that the law is, and " that the courts have gone no farther upon this subject than to hold, that the bona fide indorsee of a bill of lading for value is not liable to have the property which it represents stopped *in transitu* by his consignor on account of the non-payment of the purchase price," and " that the holder of such a bill void [voidable ?] on account of fraud, cannot confer a better title than he had himself" ? (16 *N. Y. Rep.* 332.) By the use of the term *void*, I presume is here meant *voidable;* for in the connection here used, a bill of lading is never absolutely void, but only voidable at the instance of the aggrieved party, and in that sense it is every day's experience that a fraudulent vendee can confer upon a bona fide purchaser a better title than he himself had. And for the purpose of this argument, a bona fide indorsee of the bill of lading for value stands in all substantial respects in the attitude of a purchaser of the goods. The bill of lading is the symbol of title, and the evidence of possession. It is the *key* of the canal boat *warehouse.* The master of the boat holds the goods for, and as being in the possession of, the party named as *owner* in the bill of lading. The party then has all the possession of which the nature of the thing is capable, while in the act of transportation by another party for his benefit. And the advance upon the credit of the goods, whether to the full or only the partial value, makes him *pro tanto* the *purchaser* of the goods—the *conditional* purchaser—the purchaser until the amount of the advances is reimbursed, or what is the same thing, the lien-holder or mortgagee. The *indorsement* of the bill of lading is the bill of sale of the goods. By commercial usage it has this effect, in the same manner and to the same extent as if the bill of sale or transfer of title was written out

at length upon the back of the bill of lading. To this extent the negotiability of these instruments has never, so far as I know, been questioned. The plaintiffs, therefore, as bona fide indorsees for value of the bill of lading, stand in precisely the same light as any other bona fide purchasers of property from a fraudulent vendee. The vendors in this as in other cases of a bona fide change of ownership, lost their right of stoppage *in transitu*, and not the less so, though the purchase from them was fraudulent. Strictly and technically speaking, perhaps the right of stoppage *in transitu* in most cases applies to a case where the purchase may have been fair, but the purchaser is, or becomes, insolvent; but was it ever doubted that it could also, and more emphatically, be exercised where the purchase was fraudulent, and the lawfulness of the exercise of this right in each case depends, when exerted against another party than the original purchaser, upon the question has such party obtained the transfer of title in good faith, for value and upon the presumed ownership of the goods in his vendor? If so, the right of stoppage *in transitu* is at an end. Under the facts proved and found, therefore, the plaintiffs are bona fide holders for value of the bill of lading and of the corn, under a bill of lading lawfully executed and delivered to their vendor by the original owners of the goods and of the shipping boat, with nothing to impeach their title except the fraud of their vendor, of which they were ignorant. I think this gives them a good title as against a subsequent purchaser from the original owners.

3. Assuming the facts of the case to be such as have been before mentioned and such as have been found by the trial court, I am of opinion that the right of the plaintiffs to recover stands firm upon the 1st and 2d sections of the factor's act. (3 *R. S.* 76, *5th ed.*) That act in substance provides that every consignee of merchandise shall be entitled to a lien thereon for any money advanced or negotiable security given by such consignee to or for the use of the person in whose name the shipment thereof shall be made, and that such last

The People *v.* Comm'rs of Assessments &c. in New York.

named person shall be deemed the true owner of such merchandise, unless the consignee shall have notice to the contrary by the bill of lading or otherwise. The case of the plaintiffs, as established by the evidence and found by the court below, seems to stand precisely in the predicament contemplated by this act. The plaintiffs being therefore protected by this act, having the constructive and the actual possession of the goods under the bill of lading—being deprived of that possession by Niles & Wheeler—finding their property subsequently in possession of the defendants, who upon demand refused to deliver the same to them, were entitled, I think, to maintain the action of replevin and to recover the corn or its value. The view of the case taken by the court below was correct, and the judgment of the circuit court should be affirmed.

[ALBANY GENERAL TERM, September 3, 1860. *Gould, Hogeboom* and *Bockes,* Justices.]