GEORGE H. MULLER, Appellant, v. JOHN PONDIR, impleaded, &c., Respondent.

(GENERAL TERM, FIRST DEPARTMENT, NOVEMBER, 1872.)

The right of stoppage *in transitu* is applicable to bills of exchange.

So held of bills purchased by the sender with his own funds, but upon the request and for the benefit of the person to whom they were sent.

One who has obtained knowledge of a private communication addressed to another party cannot claim to estop the person making the communication by statements therein contained.

Accordingly *held*, that a telegram from the sender of such bills of exchange, informing the person to whom they are sent, of the transmission, and describing the character of the bills, is not such an admission of the latter's ownership that, if he obtains credit on the strength of the telegram, it will estop the sender from reclaiming the bills *in transitu* .

Such a telegram has none of the qualities of a bill of lading, and a transfer of it does not cut off the sender's rights *in transitu*.

A transfer of negotiable bills without indorsement by the payee, confers no other rights than those of the transferor.

An agreement of the person to whom bills of exchange have been sent to hand them over when received, is not a present transfer, delivery, or assignment, of them.

Without the means of obtaining possession of bills of exchange, one who claims them as security for a loan by title from the party to whom they were sent, and against the sender cannot, before delivery, be a pledgee of them.

In the absence of proof, as to the amount of labor performed by a receiver, the reasonable rate of allowance for his commissions and expenses is according to the rate fixed by the statute for executors.

APPEAL from a judgment entered in the action after a trial before one of the justices of the Supreme Court without a jury, upon his decision directing judgment in favor of the defendant, Pondir, for the amount of certain bills, less receiver's fees; and also from an order entered, fixing the commissions and expenses of the receiver therein.   The facts are stated in the opinion.

*T. C. T. Buckley* and *E. W. Stoughton*, for the appellant.

*W. W. McFarland*, for the respondent.

Present—INGRAHAM, P. J.; LEONARD and LEARNED, JJ.

LEARNED, J.   The plaintiff Muller, under the name of Muller & Co., a correspondent at Havana of Schepeler & Co. of New York, drew bills in his firm name on Schrœder & Co. of London and sold them.   With the avails he bought currency bills on New York, and the same were made payable to the order of Smith, a clerk of Schepeler & Co.   This transaction was all done at the request and by the direction of Schepeler & Co. through a telegram.   At this time Schepeler & Co. were indebted to Schrœder & Co. over £10,000, and Muller & Co. were not indebted to Schepeler & Co. in any amount.   These currency bills, amounting in the aggregate to $60,000, were on the 13th day of May, 1869, by Muller & Co., inclosed in an envelope, directed to Schepeler & Co., and delivered to the purser of the Cleopatra at Havana, to be by him deposited in the post-office at New York.   At three o'clock of Saturday, the 15th of May, Schepeler & Co. failed for a large sum.   On the morning of Monday, the 17th, Muller & Co. hearing of this failure, telegraphed to Muller & Bastian, their agents at New York; and in pursuance of this telegram these agents on that day requested Schepeler & Co.

to hand to them the letter inclosing these bills on its arrival; the *Cleopatra* not having then arrived.

There is some conflict as to the conversation at that time; but it appears by all the witnesses that Schepeler & Co. did not at the time make any claim, on their own account, to the bills, nor dispute the justice of giving them up to Muller & Co., so far as Schepeler & Co.'s rights were concerned. It was claimed that the rights of other parties had intervened, as hereinafter stated. Early on Tuesday, the 18th, this action was commenced, and the injunction was served on Schepeler & Co. by nine A. M. On that same day, the 18th, the *Cleopatra* arrived. The agents of Muller & Co. applied by seven A. M. at the post-office for the letter inclosing the remittance, but it was not there. About twelve o'clock noon of that day the letter was deposited in the post-office, and the agents of Muller & Co. again applied for it. The delivery of the letter and remittance to Schepeler & Co. having been enjoined in this action, the funds in dispute have passed into the hands of a receiver, who holds them subject to the final judgment herein.

On the 13th of May the plaintiff telegraphed Schepeler & Co. as follows:

" To SCHEPELER & Co., New York:

" Drew nine (9), twelve (12) and eleven three-quarters (11¾), remit *Cleopatra*, sixty thousand (60,000), twenty-six half (26½).

" MULLER."

On the morning of the 14th, Schepeler & Co. called on the defendant Pondir, exhibited to him this telegram, and applied for a loan of $70,000. Pondir consented to make the loan if Schepeler & Co. would surrender the telegram and write a letter expressing their understanding. Accordingly, on that day, Schepeler & Co. wrote the following letter inclosing the telegram:

" NEW YORK, 14*th May*, 1869.

" JOHN PONDIR, Esq.:

" DEAR SIR.—Being in want of some funds and not having any available securities at hand, we inclose the cable tele-

gram from Havana advising remittance of about $60,000, currency, which, in case you can furnish us the money, we shall hand over to you on their arrival.

"Yours truly,

(Signed)          "SCHEPELER & CO."

And thereupon Pondir, on that day, loaned them $70,000.

On this state of facts it was held by the learned justice who tried the cause, that, as against Schepeler & Co., the plaintiff had no right to stop the currency bills *in transitu*, and that therefore Pondir was entitled to recover; although he could not be regarded as having parted with his money in the usual course of business, because the notes were not indorsed or delivered to him. It may be remarked, in passing, that in this view of the case; that is, if Muller had no right to the bills, and if Pondir did not part with his money in the usual course of business, but relied on Schepeler's agreement, then it would seem to follow that the funds would have to go to Schepeler & Co.'s general assignee, if they had one.

The first inquiry then must be, what are the rights of the plaintiff in respect to these bills as against Schepeler & Co. Schepeler & Co. had parted with nothing for the bills, and had assumed no obligation for them. Their obligation to protect the sterling bills drawn by Muller & Co. on Schrœder & Co. was practically only an obligation to repay to Muller & Co. money advanced for their benefit; or, more strictly, it was an obligation to protect Muller & Co. against a liability assumed for their benefit. When Muller & Co. purchased these currency bills with funds raised on their own credit; either they owned the bills absolutely, or at least they had a right to retain them in case of Schepeler & Company's failure. Suppose that before Muller & Co. had delivered these bills to the purser of the ship, the failure had occurred and they had heard of it; would it be claimed that Muller & Co. were bound to forward these bills to a bankrupt house? It is unnecessary to argue such a question. Suppose that they had heard of the failure before the sailing of the Cleopatra, could they not have reclaimed

the bills from the purser? And so coming farther down until the time that the property actually should reach the possession of Schepeler & Co., what principle of justice should prevent Muller & Co. from reclaiming property (or bills of exchange) for which they had paid the full value, and Schepeler & Co. had paid nothing?

In *Harris* v. *Pratt* (17 N. Y., at p. 263), it is well said by Judge STRONG, that "the basis of this right (of stoppage *in transitu*) is, that the insolvency of the vendee was not contemplated by the vendor in the sale, and that it is plainly just that he should, on account of that unforeseen event endangering the loss of the price to be paid, be permitted to reclaim the goods and keep them as security for payment at any time before a delivery terminating their transit." In the present case there is no question that the plaintiff exercised his right before the delivery terminating the transit. The point, however, insisted on by the defendant and on which the learned judge who tried the action decided it, is that the plaintiff was a surety, and therefore did not stand in such a relation to Schepeler & Co. as authorized him to stop the bills *in transitu* And this view was supported by the case of *Siffken* v. *Wray* (6 East., 371). In that case, Browne, the bankrupt vendee, after his bankruptcy, received the bills of lading and delivered them to the defendant Wray, an agent of one Fritzing, that he might apply the avails of the goods to the payment of the drafts drawn against them. Dubois & Co. were the shippers of the goods. Fritzing had accepted their drafts, at the request of Browne. It was held that the proceeding was not a stoppage *in transitu*, because it was not done adversely, but the goods were obtained by the voluntary agreement of the bankrupt; that Fritzing had no right to stop *in transitu*, because he was not a vendor, but only a surety to the vendor; and that Dubois & Co. had not in fact stopped the goods, because the defendant Wray was not their agent. Now, if that case be analogous to the present, then Schrœder & Co., if they had accepted the sterling bills, would be the parties

in the position analogous to that of Fritzing; while Muller & Co. would be in the position analagous to that of Dubois & Co. And the decision in that case was not that Dubois & Co. *could not* have stopped the goods, but that they *did not*. They were not parties to the attempt to get possession of the goods. The decision was, that Fritzing could not stop the goods; and the principle involved might be material here if this were an action by Schrœder & Co. after acceptance of the sterling bills. But this is an action by Muller, who occupies the same relative position with that of Dubois & Co. in that case. That decision is only important, therefore, in this respect, that it incidentally implies that Dubois & Co. *might* have stopped the goods; and this supports the rights of this plaintiff.

Turning then to the case of *Feise* v. *Wray* (3 East., 93), we shall find it decisive in favor of the plaintiff as against Schepeler Co., unless a rule is to be applied to bills of exchange different from that which was there applied to merchandise. I see no reason for any difference, and, both on principle and authority, I think that as against Schepeler & Co. the plaintiff's right is clear and just. The next question to consider is, whether Pondir, by the transaction of May 14th, acquired any better title than Schepeler & Co. had.

The learned justice was of opinion that he could not be regarded as having parted with his money in the usual course of business, because the notes were not indorsed and delivered to him. This is a familiar principle, which, in the absence of any peculiar circumstances, would be decisive. But the defendant Pondir, relies on the telegram of Muller, shown to him; and claims that he parted with his money on the strength of the information therein contained.

In examining the effect of this telegram, it is to be noticed that nothing which Schepeler wrote or said to Pondir at the time of the transaction is binding on Muller by way of admission or estopped. For instance, Schepeler said that they were expecting money from Havana; and he wrote at Pondir's request a letter to him, saying that the telegram advised

a remittance of $60,000 currency. Now these statements of Schepeler can in no way affect Muller's right. To illustrate; if there had been no telegram from Muller, and if Schepeler, knowing the fact of this remittance, had made to Pondir the same statements, it is clear that such statements could not in any way estop Muller.

Suppose that Muller had bought these bills entirely on his own account and had sent them to Schepeler, being himself the absolute owner of them : if, under such circumstances, Schepeler had pretended to Pondir that the bills which he was about to receive were his own, such pretences could not have deprived Muller of his property.

We must then confine ourselves to Muller's *telegram* and to Schepeler's *acts;* and the inquiry must be, what did that telegram authorize a third party to believe in respect to these bills, and what did Schepeler *do* in respect to them at the time of the loan.

Giving the telegram, so far as it touches these bills, its full import, it can only mean that Muller & Company had remitted to Schepeler & Co., by the Cleopatra, $60,000 of currency bills, purchased at twenty-six and a half discount. As to the ownership of the bills; the purposes for which they were transmitted, or the respective rights of Muller & Co. and Schepeler & Co. therein, the telegram is silent. It is such a telegram as might have been sent if the remittance had been absolutely the property of Muller & Co., and had been sent by them for some special purpose to Schepeler & Co. It contains no statement or admission that the bills of exchange belonged to Schepeler & Co. Again, a telegram is a private communication. It is not addressed to the public or to whomever may see it. Often from its brevity it can only be correctly understood by the person to whom it is sent; and often, therefore, no document is so unsuited for the perusal of third parties. It is not necessary in a telegram to guard against the misunderstanding of it by the public. It is enough that the receiver knows its meaning. Even then if this telegram had contained admission of Schepeler & Co.'s

ownership of the bills, Pondir could not claim that Muller & Co. were thereby estopped; for the statement would not have been made to *him*, and he would have had no right to rely on it.   One who has obtained knowledge of a private communication, addressed to another party, cannot claim to estop the person making the communication by statements therein contained.

It will probably be found, in all the numerous and varied cases of estoppel *in pais*, that the words which have been held to estop a party have been addressed to the party who claims the benefit of the estoppel, or to the public.

And where the estoppel has been the result not of words, but of silence, there the party estopped has had knowledge of some transaction, and has neglected to assert rights of his, affected thereby.   This present case contains neither of those elements.

The argument of the defendants' counsel is that Muller & Co. were merely the agents of Schepeler & Co.; that the currency bills were the legal property of Schepeler & Co. from the beginning, and that the telegram is an admission of that fact.   But the money with which the currency bills were purchased was money raised on the credit of Muller & Co.; not on that of Schepeler & Co.   It was the money of Muller & Co., and the obligation of Schepeler & Co. depended upon their receiving the property purchased with those funds.   Even, therefore, admitting the agency of Muller & Co., they had advanced funds for the purchase of these bills, and they justly had a right to reclaim them, when the failure of Schepeler & Co. had taken away all value from their obligation to protect; and there is in the telegram no admission contrary to this right.

The right of stoppage *in transitu* is cut off by the transfer of the bill of lading to a *bona fide* purchaser.   (See *Perrin* v. *Dows*, 16 N. Y., 325; *Holbrook* v. *Vose*, 6 Bosw., 76.)   But this telegram is not a bill of lading.   It has none of the qualities of that instrument.   (See *Bonito* v. *Mosquera*, 2 Bosw., at 438.)   It was not negotiable or *quasi* negotiable. The transfer of the telegram, therefore, did not, like the

transfer of a bill of lading, cut off Muller's rights. Again, as stated by the learned justice, Pondir did not part with his money in the usual course of business, because the bills were not indorsed and delivered to him. In the case of *Hedges* v. *Sealey* (9 Barb., 214), it was held that where a note negotiable, but not indorsed, is transferred to another by delivery merely, the holder of the note is a mere assignee taking only the rights of the assignor. This doctrine has been recognized since in other cases. (*Gilbert* v. *Sharp*, 2 Lansing, 412.) In the case of *Russell* v. *Scudder* (42 Barb., 31), it was held that a verbal pledge of a negotiable instrument, without a delivery or an absolute transfer, will not make the pledgee a *bona fide* holder. Now, in the present case there was no indorsement of the bills; next there was no delivery of them; and lastly an examination of the letter of Schepeler & Co. will show that there was not even a present assignment. There was an agreement that, at a future time, they would hand over the bills. And the reliance of Pondir in making the loan was therefore on the promise of Schepeler & Co.

Pondir did not purchase the bills. He claims them only as collateral security. The transaction, therefore, if valid, was a pledge of the bills. (*White* v. *Platt*, 5 Denio, 269; *Wheeler* v. *Newbould*, 16 N. Y., 392.) "Possession must uniformly accompany a pledge." "Goods on sea may be passed in pledge by a transfer of the muniments of title, as by a written assignment of the bill of lading. This is equivalent to actual possession, because it is the means of obtaining possession." (*Wilson* v. *Little*, 2 N. Y., 447.) But in the present case Pondir never had the means of obtaining possession of the bills. His possession of the telegram, with the letter of Schepeler & Co., gave him no power over the bills. Schepeler & Co. had agreed that, when the bills arrived, they would hand them to him. It was contemplated, therefore, that the bills should go into Schepeler & Co.'s hands, and should then be delivered to him. Between these two parties it might be equitable that Schepeler & Co. should perform this contract; just as it would

Muller *v.* Pondir.

be equitable that they should perform every contract. But there seems to have been nothing to prevent Schepeler & Co.; on the arrival of the steamer, from taking the bills and using them as they pleased; so that, even as against Schepeler & Co., Pondir does not seem to have obtained possession either of the securities, or of a "muniment of title," which would enable him to take possession of them. His claim is the promise of Schepeler & Co. to hand him securities at a future day; and when that day came Schepeler & Co. had no real interest in the expected securities. Coming to the conclusion, therefore, that, as against Schepeler & Co., the plaintiff is entitled to the moneys in dispute, and that Pondir stands in no better position than Schepeler & Co., it becomes unnecessary to examine whether or not the debt to Pondir was, in fact, subsequently paid.

It follows that the judgment of the Special Term must be reversed, and that the plaintiff is entitled to recover the proceeds of the bills now on deposit subject to the order of the court, after deducting the receiver's commissions and expenses, and that the plaintiff recover his costs against Pondir.

The plaintiff also appealed from the order directing the New York Life Insurance and Trust Company to pay the receiver five per cent on the amount in their hands, and also $600 expenses. The order granting these commissions and expenses does not purport to have been granted on any affidavits or on the hearing or motion of either of the parties. No affidavits appear in the case showing that there were any expenses, or that there was anything peculiarly difficult in the receiver's duties. By a previous order in the action, made before the trial, the receiver had been allowed $550 for expenses and commissions, besides his attorney's costs in certain actions. So far as may be judged from the nature of the case, the receiver's duties must have consisted in receiving the money and depositing it in the New York Life Insurance and Trust Company to the credit of this action.

Without some proof of the amount of duty performed, it seems reasonable to take the rate fixed for executors. The

order as to the receiver's commissions and expenses should, therefore, be reversed, and he should be allowed only at the rate fixed for executors, together with his expenses, to be shown by affidavit, and to be adjusted by the Special Term on notice to the parties.

Judgment reversed.